In the MATTER OF A PRIVATELY FILED CRIMINAL
COMPLAINT:

STATE of Wisconsin EX REL. Ralph A. KALAL and
Jackie Kalal, Petitioners-Petitioners,

v.

CIRCUIT COURT FOR DANE COUNTY, the Honorable
John V. Finn, presiding, Michele A. Tjader and
Sarah Schmeiser, Respondents.

Supreme Court

*No. 02–2490–W. Oral argument January 14, 2004.—Decided
May 25, 2004.*

2004 WI 58

(Also reported in 681 N.W.2d 110.)

For the petitioners-petitioners there were briefs by *Waring R. Fincke,* West Bend, and oral argument by *Waring R. Fincke.*

For the respondents, Circuit Court of Dane County and the Honorable John V. Finn, there was a brief by *David C. Rice,* assistant attorney general, with whom on the brief was P*eggy A. Lautenschlager,* attorney general, and oral argument by *Anthony M. Tomaselli* and *Quarles & Brady, LLP,* Madison.

¶ 1. DIANE S. SYKES, J. In Wisconsin, the district attorney is primarily responsible for the decision whether to charge a person with a crime. Wisconsin Stat. § 968.02(1) states the general rule: "[e]xcept as otherwise provided in this section, a complaint charging a person with an offense shall be issued only by a district attorney of the county where the crime is alleged to have been committed."

¶ 2. There are exceptions to this rule, however, and this case arises from one of them. Subsection (3) of Wis. Stat. § 968.02 provides that "[i]f a district attorney *refuses or is unavailable* to issue a complaint, a circuit judge may permit the filing of a complaint, if the judge finds there is probable cause to believe that the person

to be charged has committed an offense." Wis. Stat. § 968.02(3) (2001–02) (emphasis added.)[1]

¶ 3. This case involves an effort by a Madison attorney to invoke this procedure against her former employer and his wife for allegedly stealing funds earmarked for her retirement account. The attorney, Michele Tjader, first complained to the Madison Police Department and the Dane County District Attorney about the alleged theft by Ralph and Jackie Kalal. Several months later, after receiving word from the district attorney that she "was free to proceed legally in whatever manner she believed necessary," Tjader filed a motion pursuant to Wis. Stat. § 968.02(3) for the issuance of a criminal complaint against the Kalals. A circuit judge authorized the filing of the proposed complaint.

¶ 4. The Kalals moved for reconsideration, arguing that the record did not establish that the district attorney had "refused" to issue a complaint as required by Wis. Stat. § 968.02(3). The circuit judge held that the Kalals had no standing to be heard, but addressed the motion anyway and denied it. The Kalals sought a supervisory writ in the court of appeals. The court of appeals declined to issue the writ because applicable writ standards had not been met. We accepted review, and now affirm the denial of the writ.

¶ 5. We agree with the circuit judge that because Wis. Stat. § 968.02(3) expressly specifies an ex parte proceeding, the person who is the subject of the proposed complaint may not obtain reconsideration of a judge's decision to permit its filing. We also agree with the court of appeals that applicable writ standards have

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

not been established. Nevertheless, we reach the merits of the statutory interpretation question presented here, as it might otherwise evade review.

¶ 6. By its terms, Wis. Stat. § 968.02(3) requires the circuit judge to make two determinations prior to authorizing the issuance of a complaint: 1) that "the district attorney *refuses* or *is unavailable* to issue a complaint;" and 2) that "there is probable cause to believe that the person to be charged has committed an offense." The statute contemplates an exercise of discretion by the judge following these threshold determinations: the statute says the judge "may permit" the filing of a complaint. Wis. Stat. § 968.02(3).

¶ 7. Probable cause is not at issue here, nor is there a challenge to the judge's exercise of discretion to permit the filing of the complaint. We are confronted only with a question about the meaning of the term "refuses" in the statute. To "refuse" is to indicate unwillingness to do a thing. As the term is commonly understood, a "refusal" involves a decision to reject a certain choice or course of action. A "refusal," however, need not necessarily be expressed in particular or explicit terms to be understood as a refusal. A district attorney's refusal to issue a complaint for purposes of Wis. Stat. § 968.02(3) may be established directly or circumstantially.

¶ 8. We therefore reject the Kalals' argument that only a direct and unequivocal statement from the district attorney—e.g., "I refuse to issue a complaint"—can satisfy the statute. Such a literal reading would nullify the statute by permitting the district attorney to defeat the statutory procedure by responding to the complainant in equivocal or vague terms. On the other hand, to equate refusal with mere inaction runs contrary to the accepted meaning of the term and could

644

undermine the district attorney's exercise of prosecutorial discretion or interfere with ongoing criminal investigations. The judicially-authorized criminal complaint under Wis. Stat. § 968.02(3) is not a substitute for the district attorney's exercise of charging discretion. Rather, it operates as a limited check upon the district attorney's charging power and by its terms may be invoked only when a complainant can demonstrate that the district attorney has in fact refused to charge, or is unavailable to do so.

## I. FACTS AND PROCEDURAL HISTORY

¶ 9. Until August of 2001, Michele Tjader and Sarah Schmeiser were employed by Kalal and Associates, a Madison law firm owned by Ralph Kalal. Kalal's wife, Jackie, was the office manager for the firm. On February 25, 2002, Tjader filed a motion in Dane County Circuit Court requesting the issuance of a criminal complaint against Ralph and Jackie Kalal under Wis. Stat. § 968.02(3). Tjader's complaint, asserting four counts of felony theft, alleged that the Kalals stole funds withheld for Tjader and Schmeiser's 401K retirement accounts. Tjader informed the court that she had reported the alleged theft to the City of Madison Police Department in August 2001, and that in November 2001, she had written to the Dane County District Attorney asking him to bring charges against the Kalals. Tjader stated in her motion that the district attorney's response was to tell her she "was free to proceed legally in whatever manner she believed necessary." The motion also asserted, more generally, that the district attorney "has refused to charge the defendants."

¶ 10. The matter was assigned to Portage County Circuit Court Judge John V. Finn, who held a hearing on Tjader's motion on March 13, 2002. Tjader and

Schmeiser appeared at the hearing, as did Jason Hanson, a Dane County Deputy District Attorney. Hanson acknowledged that Tjader had contacted the district attorney's office "some months ago," and that the office had not filed a complaint in the matter. Hanson advised Judge Finn that he thought the district attorney's response to Tjader qualified as a refusal to prosecute under the statute:

> I don't think our office has ever affirmatively stated we would not prosecute. What we have done is fail to do so, so I think a fair reading of refusal in the statute encompasses both of the situations. We haven't told Ms. Tjader that we're not going to seek charges. We simply haven't done it yet.

¶ 11. Tjader testified at the hearing and briefly recounted her tenure at Kalal and Associates, the circumstances surrounding the establishment and banking of the 401K accounts, and the Kalals' alleged malfeasance. Tjader described her contacts with the Madison Police Department and with the district attorney's office, explaining that "the impression I got was that the matter was closed and that was why I was getting the invitation to do what I felt needed to be done." Schmeiser also testified to the circumstances of her employment and the alleged theft of her 401K funds.

¶ 12. Judge Finn then addressed the elements of the theft charge under Wis. Stat. § 943.20(1)(b), made a factual finding that the district attorney had refused to prosecute, and concluded that probable cause existed to believe the Kalals were guilty of theft. He directed the filing of a complaint "consistent with the criminal complaint that is proposed by Ms. Tjader." At Hanson's request, the judge ordered the appointment of a special prosecutor. On March 28, 2002, Dane County Circuit

Judge Michael Nowakowski appointed Anthony A. Tomaselli as special prosecutor.

¶ 13. On April 29, 2002, the Kalals filed a motion to reconsider and discharge the special prosecutor. Without explicitly contradicting Judge Finn's finding that the district attorney's conduct constituted a refusal under Wis. Stat. § 968.02(3), the Kalals argued that allowing a private citizen to "short circuit" a prosecutor's discretion violates separation of powers by "unwarranted judicial intervention into the discretion vested in our publicly elected prosecutors." Attached to the reconsideration motion was a copy of a November 29, 2001, letter from Dane County District Attorney Brian Blanchard to Tjader, informing her that the complaint had been referred to a detective in the Madison Police Department. In the letter, Blanchard also asked Tjader to consider the heavy caseloads of police detectives and the fact that a case involving misuse of pension funds "is not necessarily simple," and suggested that if the case were chargeable as criminal theft, then "it must be a very straightforward civil suit."

¶ 14. Special prosecutor Tomaselli responded by arguing that the Kalals had no standing to challenge Judge Finn's order directing the filing of a criminal complaint against them. Tomaselli also argued that the premise of the Kalals' objection to Judge Finn's order—namely, that the district attorney's refusal must be explicit—would, if accepted, enable the district attorney to nullify the operation of the statute by withholding an explicit refusal.

¶ 15. By written decision dated August 2, 2002, Judge Finn held that the Kalals had no standing to contest the order permitting the filing of the complaint because the statute "contemplates an ex parte proceeding with no right of cross-examination by the defen-

dants or anyone else." Judge Finn addressed the merits of the Kalals' motion, however, and reiterated his finding that the district attorney's conduct from the date of Tjader's initial complaint to the date of the hearing, combined with Deputy District Attorney Hanson's statements at the hearing, constituted a refusal under the statute.

¶ 16. The Kalals sought a supervisory writ in the court of appeals pursuant to Wis. Stat. § 809.51,[2] reiterating their contention that the district attorney had not refused to issue a complaint within the meaning of Wis. Stat. § 968.02(3). Uncertain about its jurisdiction, the court of appeals held the petition in abeyance until our resolution of *State ex rel. Unnamed Person No. 1 v. O'Brien,* 2003 WI 30, 260 Wis. 2d 653, 660 N.W.2d 260. The *Unnamed Person No. 1* case arose out of a John Doe proceeding under Wis. Stat. § 968.26, but its holding that the court of appeals has supervisory writ jurisdiction over the actions of a judge sitting ex parte as a judge, not a court, applies equally to proceedings conducted by a judge pursuant to Wis. Stat. § 968.02(3). After *Unnamed Person No. 1* was released, the court of appeals addressed the merits of the Kalals' petition and declined to issue the writ, concluding that applicable supervisory writ standards—specifically, a violation of a "plain duty" by the circuit judge—had not been established. More specifically, the court concluded that nothing in Wis. Stat. § 968.02(3) requires that the district attorney's refusal be explicit, and therefore Judge Finn's "refusal" finding and subsequent order permit-

---

[2] "A person may request the court to exercise its supervisory jurisdiction . . . over a court and the presiding judge, or other person or body, by filing a petition and supporting memorandum." Wis. Stat. § 809.51(1).

ting the filing of a complaint against the Kalals did not violate a plain duty. We accepted review.

## II. SUPERVISORY WRIT STANDARDS

¶ 17. A "writ of supervision is not a substitute for an appeal." *State ex rel. Dressler v. Circuit Court for Racine County,* 163 Wis. 2d 622, 630, 472 N.W.2d 532 (Ct. App. 1991). The decision whether to issue a supervisory writ "is controlled by equitable principles and, in our discretion, we can consider the rights of the public and third parties." *Id.* A supervisory writ "is considered an extraordinary and drastic remedy that is to be issued only upon some grievous exigency." *Id.* A petitioner seeking a supervisory writ must establish the following:

> A petition for a supervisory writ will not be granted unless: (1) an appeal is an inadequate remedy; (2) grave hardship or irreparable harm will result; (3) the duty of the trial court is plain and it must have acted or intends to act in violation of that duty; and (4) the request for relief is made promptly and speedily.

*Burnett v. Alt,* 224 Wis. 2d 72, 96–97, 589 N.W.2d 21 (1999) (citing *State ex rel. Oman v. Hunkins,* 120 Wis. 2d 86, 91, 352 N.W.2d 220 (Ct. App. 1984); *see also Dressler,* 163 Wis. 2d at 630 (separating the third of these factors into two, for a total of five factors).

## III. DISCUSSION

### A. Standing

¶ 18. Judge Finn concluded that the Kalals lacked standing to bring a motion for reconsideration from his decision to permit the filing of a criminal complaint

pursuant to Wis. Stat. § 968.02(3). He was correct. The statute does not confer upon the person who is the subject of a proposed prosecution the right to participate in any way or to obtain reconsideration of the ultimate decision reached. The statute provides:

> If a district attorney refuses or is unavailable to issue a complaint, a circuit judge may permit the filing of a complaint, if the judge finds there is probable cause to believe that the person to be charged has committed an offense after conducting a hearing. If the district attorney has refused to issue a complaint, he or she shall be informed of the hearing and may attend. The hearing shall be ex parte and without the right of cross-examination.

Wis. Stat. § 968.02(3).

¶ 19. The statute expressly specifies an ex parte hearing and no right of cross-examination. If the Kalals have no right or standing to be heard at the hearing, they cannot claim a right or standing to be heard on a reconsideration motion.

¶ 20. This is not to say that a judge's decision to issue a complaint pursuant to this procedure is completely unreviewable. A defendant named in a complaint issued pursuant to subsection (3) of the statute has the same opportunity to challenge in circuit court the legal and factual sufficiency of that complaint as a defendant named in a complaint issued pursuant to subsection (1). This includes, in felony prosecutions, the right to a preliminary hearing under Wis. Stat. § 970.03.

¶ 21. The court of appeals has previously held that there is no right to appeal a decision of a judge on a petition under Wis. Stat. § 968.02(3). *Gavcus v. Ma-*

*roney,* 127 Wis. 2d 69, 70, 377 N.W.2d 201 (Ct. App. 1985). However, supervisory writ procedure, such as that which was invoked here, has been used in limited circumstances to obtain review of a judge's decision under this statute. *See State ex rel. Unnamed Petitioner v. Circuit Court for Walworth County,* 157 Wis. 2d 158, 458 N.W.2d 575 (Ct. App. 1990). In any event, because Wis. Stat. § 968.02(3) specifies an ex parte procedure, a defendant named in a complaint issued pursuant to the statute cannot challenge the judge's decision by way of a motion for reconsideration.

## B. Violation of a Plain Duty

■

¶ 22. A basic requirement for the issuance of a supervisory writ by an appellate court is a violation or impending violation of a plain duty by the circuit court judge. A plain duty "must be clear and unequivocal and, under the facts, the responsibility to act must be imperative." *State ex rel. Kurkierewicz v. Cannon,* 42 Wis. 2d 368, 377–78, 166 N.W.2d 255 (1969).

¶ 23. The Kalals' briefs do not explain precisely how Wis. Stat. § 968.02(3) imposes a plain duty upon the judge, but at oral argument counsel advanced the proposition that the statute's requirement of a refusal by the district attorney to file charges suggests that the circuit judge has a plain duty to correctly determine the presence of this threshold refusal before authorizing the issuance of a criminal complaint. In essence, the Kalals argue that the judge sitting ex parte in a hearing under Wis. Stat. § 968.02(3) has a plain duty to correctly find facts and apply the law.

¶ 24. We cannot accept this proposition, as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law. The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system. The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process. *See Burnett,* 224 Wis. 2d at 96–97; *see Gavcus,* 127 Wis. 2d at 70. To adopt the Kalals' interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process.

¶ 25. To the extent that a circuit judge's decision to permit the filing of a complaint under Wis. Stat. § 968.02(3) is legally or factually unsupported, the defendant named in the complaint may seek its dismissal in the circuit court after it has been filed, and may pursue standard appellate remedies thereafter. But the statutory prerequisite that the judge find a refusal to prosecute by the district attorney does not impose upon the circuit judge a plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ.

¶ 26. Although the Kalals have failed to establish the existence of a plain duty and are not entitled to a supervisory writ, we will address the statutory interpretation question presented by this case. The proper interpretation of the term "refuses" in Wis. Stat.

652

§ 968.02(3) is central to the administration of this statute. It is also a question that is likely to recur but evade review, because a decision under the statute is not itself directly appealable, and the scope of supervisory writ procedure is limited to violations of a plain duty.

C. Wisconsin Stat. § 968.02(3)

i. Separation of powers/charging power and discretion

¶ 27. District attorneys in Wisconsin have primary responsibility and wide discretion to determine whether to commence a criminal prosecution. *State v. Karpinski,* 92 Wis. 2d 599, 607, 285 N.W.2d 729 (1979). The authority is conferred by Wis. Stat. § 968.02(1), which provides that "[e]xcept as otherwise provided in this section, a complaint charging a person with an offense shall be issued only by a district attorney of the county where the crime is alleged to have been committed."

¶ 28. But the district attorney's charging power is not unlimited or unfettered. "The district attorney in Wisconsin is a constitutional officer and is endowed with a discretion that approaches the quasi-judicial." *Kurkierewicz,* 42 Wis. 2d at 378 (citing *State v. Peterson,* 195 Wis. 351, 359, 218 N.W. 367 (1928)).[3] The district

---

[3] In *State v. Kenyon,* 85 Wis. 2d 36, 45, 270 N.W.2d 160 (1978), we withdrew language in *State ex rel. Kurkierewicz v. Cannon,* 42 Wis. 2d 368, 379, 166 N.W.2d 255 (1969), that denied the court any power to interfere with a prosecutor's conduct of a criminal case, having recognized that this language (a quotation from Corpus Juris Secundum) conflicts with our decision in

attorney's role is "quasi-judicial" in the sense that it is his or her duty to administer justice rather than simply obtain convictions. *Karpinski,* 92 Wis. 2d at 607; *Kurkierewicz,* 42 Wis. 2d at 378.

¶ 29. The sine qua non of the charging decision is probable cause. *Bordenkirscher v. Hayes,* 434 U.S. 357, 364 (1978). "In our system, so long as a prosecutor has probable cause to believe that the accused has committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.*

¶ 30. We have recognized that "[t]here is no obligation or duty upon a district attorney to prosecute all complaints that may be filed with him." *Kurkierewicz,* 42 Wis. 2d at 378; *see also Thompson v. State,* 61 Wis. 2d 325, 330, 212 N.W.2d 109 (1973). While the district attorney has the power and the duty to prosecute criminal offenders, "it is obvious that a great portion of the power of the state has been placed in his hands for him to use in the furtherance of justice, and this does not per se require prosecution in all cases where there appears to be a violation of the law no matter how trivial." *Kurkierewicz,* 42 Wis. 2d at 378. In general, "the prosecuting attorney is answerable to the people of the state and not to the courts or the legislature as to the way in which he exercises power to prosecute com-

*Guinther v. Milwaukee,* 217 Wis. 334, 258 N.W. 865 (1935). *Kenyon's* very limited modification of *Kurkierewicz* has no bearing on the issues in this case.

plaints." *Karpinski,* 92 Wis. 2d at 608; *Kurkierewicz,* 42 Wis. 2d at 378; *State v. Kenyon,* 85 Wis. 2d 36, 42, 270 N.W.2d 160 (1978).

¶ 31. We have in prior cases referred to American Bar Association Criminal Justice Standard 3.9 pertaining to the exercise of charging discretion, identifying two circumstances in which prosecutorial charging discretion may be abused: "[t]his standard makes it abundantly clear that . . . it is an abuse of discretion to charge when the evidence is clearly insufficient to support a conviction. It is also an abuse of discretion for a prosecutor to bring charges on counts of doubtful merit for the purpose of coercing a defendant to plead guilty to a less serious offense." *Thompson,* 61 Wis. 2d at 329–30; *Karpinski,* 92 Wis. 2d at 609–10. A district attorney generally should not bring a charge unless he or she believes the evidence can sustain a finding of guilt beyond a reasonable doubt. Not all the guilty are convictable; moreover, convicting all the guilty may not be desirable. Full enforcement of the criminal laws "is neither possible nor desirable." 4 Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* § 13.2(d), at 22–23 (1999).

¶ 32. Accordingly, ABA Standard 3.9 specifies a number of discretionary factors beyond the question of the suspect's guilt that may legitimately be taken into consideration in the charging decision. These include the extent of harm caused by the offense; the threat posed to the public by the suspect; the ability and willingness of the victim to participate; the disproportion between the authorized punishment and the particular offense or offender; possible improper motives of a complainant; cooperation of the suspect with the arrest/prosecution of others; the possibility or likeli-

hood of prosecution by another jurisdiction. American Bar Association *Standards for Criminal Justice,* Vol. 1, Standard 3–3.9 (2d ed. 1980); *see also Karpinski,* 92 Wis. 2d at 608–09; *Thompson,* 61 Wis. 2d at 329–30. There may well be other legitimate discretionary charging factors relating to the particular circumstances of each individual complaint.

¶ 33. District attorneys did not always occupy this position of primacy vis-a-vis criminal charging decisions. From statehood until 1945, the decision to file criminal charges was vested entirely in local magistrates.[4] *State v. Unnamed Defendant,* 150 Wis. 2d 352, 363, 441 N.W.2d 696 (1989). Over time, the role of the district attorney became more prominent: from 1945 until 1969, criminal complaints were issued by magistrates or district attorneys, and in 1969, the statutes were revised to confer upon district attorneys the

---

[4] The history and constitutionality of the procedures for initiating criminal proceedings have been discussed at some length in our case law, with conflicting results. In *State ex rel. Unnamed Petitioners v. Connors,* 136 Wis. 2d 118, 401 N.W.2d 782 (1987), this court declared Wis. Stat. § 968.02(3), unconstitutional under separation of powers as an encroachment by the judicial branch into the executive branch power to initiate criminal charges. This decision was sharply criticized by Justice Steinmetz in dissent, *see id.* at 161–71 (Steinmetz, J., dissenting), and in an article by Samuel Becker, *Judicial Scrutiny of Prosecutorial Discretion in the Decision Not to File a Complaint,* 71 Marq. L. Rev. 749 (1987–88). This court overruled *Connors* in *State v. Unnamed Defendant,* 150 Wis. 2d 352, 362 n.4, 441 N.W.2d 696 (1989), citing the Becker article and belatedly recognizing that the power to issue criminal charges was historically a shared power. *See also* W. Scott Van Alstyne, Jr., Commment, *The District Attorney—A Historical Puzzle,* 1952 Wis. L. Rev. 125.

primary power to charge criminal offenses, subject to certain limited exceptions such as the one involved in this case. *Id.* at 363–64.

¶ 34. Wisconsin Stat. § 968.02 was enacted as part of a revision of the state's criminal procedure code initiated by the Criminal Rules Committee of the Judicial Council. *See* Chapter 255, Laws of 1969, Prefatory Note. This new statute governing the issuance and filing of criminal complaints represented a major concentration of charging power in the district attorney's office. *See* Wis. Stat. § 968.02(1) ("a complaint charging a person with an offense shall be issued *only* by a district attorney") (emphasis added).

¶ 35. At the same time, however, the legislature offset this power by the inclusion of a special provision, in subsection (3), as a check on the district attorney:

> [Wis. Stat. § 968.02] is a change from the present law designed to give the district attorney a greater voice in the initiating of criminal proceedings. . . .
>
> Sub. (3) provides a check upon the district attorney who fails to authorize the issuance of a complaint, when one should have been issued, by providing for a judge to authorize its issuance.
>
> Sub. (3) also provides a vehicle for the issuance of complaints when the district attorney is unavailable.

Chapter 255, Laws of 1969, Judicial Council Committee Note to Wis. Stat. § 968.02.[5] This provision has been

---

[5] Wisconsin Stat. § 968.02(3), is one of several statutory checks on the broad grant of discretion to district attorneys. Other statutes confer charging power upon state officers other than the district attorney. Some are structured in the same way as the statute at issue here: *see* Wis. Stat. § 23.65 (circuit judge may file complaint alleging violation of conservation laws if

described as important to the protection of victims' rights,[6] but it is also a vestige of a much older legal tradition that accorded judges a role—at one time the preeminent role—in deciding whether to charge suspects with crimes. *Unnamed Defendant,* 150 Wis. 2d at 363–64. As such, we have held that Wis. Stat. § 968.02(3) does not violate separation of powers, as the criminal charging power is one that has historically been shared between the executive and judicial branches. *See supra* ¶ 33 n.4; *Unnamed Defendant,* 150 Wis. 2d at 362 n.4. The Kalals therefore do not mount a direct separation of powers challenge to the statute. Rather, they argue that separation of powers principles require that the statute be interpreted strictly to minimize any encroachment by the judiciary into the district attorney's charging authority.

ii. Statutory interpretation/the statutory term "refuses"

¶ 36. Wisconsin Stat. § 968.02(3) requires the circuit judge to make two determinations before permitting the filing of a complaint: (1) a factual finding that the "district attorney *refuses* or *is unavailable* to issue a complaint;" and 2) a legal conclusion that "there is probable cause to believe that the person to be charged has committed an offense." Wis. Stat. § 968.02(3) (em-

district attorney refuses or is unavailable to do so) and Wis. Stat. § 979.04(2) (circuit court may order coroner's inquest if district attorney refuses to do so). A number of other statutes give the Department of Justice authority to prosecute crimes if the district attorney does not act: *see* Wis. Stat. §§ 5.08, 11.61(2), 19.51(1)(a), 19.97(4).

[6] *See Connors,* 136 Wis. 2d at 153 (Steinmetz, J., dissenting).

phasis added). The statute contemplates an exercise of discretion by the circuit judge if these prerequisite determinations are made: the statute specifies that the judge "may permit" the filing of the complaint, not that the judge "must" or "shall" permit it. *Id.*

¶ 37. The Kalals acknowledge that this statute has withstood challenge on separation of powers grounds. They argue, however, that the statutory term "refuses" must be accorded a strict and literal interpretation, to require a direct and explicit statement of refusal from the district attorney, in order to avoid conflict between the branches in this area of shared power. While we recognize the constitutional tension inherent in this statute, *see supra* ¶¶ 27–36, we see no reason to depart from a straightforward, plain-meaning interpretation of the statutory term "refuses."

¶ 38. More than 25 years ago this court made the following observation about statutory interpretation:

> There are two accepted methods for interpretation of statutes. The first, determining legislative intent, looks to extrinsic factors for construction of the statute. The second, determining what the statute means, looks to intrinsic factors such as punctuation or common meaning of words for construction of the statute. 2A Sutherland, *Statutory Construction* (4th ed. 1973), secs. 45.05, 45.07 and 45.14. Whichever of these methods is used, the cardinal rule in interpreting statutes is that the purpose of the whole act is to be sought and is favored over a construction which will defeat the manifest object of the act. *Statutory Construction, supra,* at pp. 56–57, sec. 46.05.

*Student Ass'n v. Baum,* 74 Wis. 2d 283, 294–95, 246 N.W.2d 622 (1976).

¶ 39. Sutherland's *Statutory Construction,* cited by Chief Justice Beilfuss in the foregoing passage from

659

*Baum,* addresses the difference between the "statutory meaning" and "legislative intent" approaches to statutory interpretation, beginning with a reference to Justice Holmes' famous quotation:

> [The "statutory meaning" approach] was stated by Justice Holmes in his remark that "we do not inquire what the legislature meant; we ask only what the statute means." [Holmes'] preference for the meaning of the statute over legislative intent as a criterion of interpretation has been expressly endorsed by Justices Jackson and Frankfurter, the latter of whom said that he even tried to avoid using the term "legislative intent." Courts have also supported the Holmes view.

Norman J. Singer, 2A *Sutherland Statutory Construction* § 45.07, at 38 (6th ed. 2000).[7] One concise statement of the Holmes' "statutory meaning" approach is the following from the United States Supreme Court: "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992); *see also Hartford Underwriters Ins. v. Union Planters Bank,* 530 U.S. 1, 6 (2000).

¶ 40. Sutherland further describes the distinction between these interpretive alternatives:

> Generally when legislative intent is employed as the criterion for interpretation, the primary emphasis is on what the statute meant to members of the legislature which enacted it. On the other hand, inquiry into the

---

[7] The famous quotation is from Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv. L. Rev. 417, 419 (1898–99).

meaning of the statute generally manifests greater concern for what members of the public to whom it is addressed, understand.

2A Norman J. Singer, *Sutherland Statutory Construction* § 45.08 at 40.

¶ 41. Sutherland suggests that an "[i]mplied endorsement of Justice Holmes' point of view is . . . discernible in the many cases which express preference for 'common,' 'ordinary,' 'natural,' 'normal,' or dictionary definitions" of statutory language. *Id.,* § 45.08 at 43. Furthermore, a "policy favoring conventional meanings and general understandings over obscurely evidenced intention of the legislators is supported in the oft-repeated premise that intention must be determined primarily from the language of the statute itself." *Id.* at 46.

¶ 42. And finally, "resource materials for statutory construction are commonly classified into two fundamentally different categories, called 'intrinsic' and 'extrinsic' aids. These characterizations refer to the text of the statute." *Id.,* § 45.14 at 109. As a general matter, "[e]xtrinsic aids . . . are useful to decisions based on the intent of the legislature, while intrinsic aids have greater significance for decisions based on the 'meaning of the statute' as understood by people in general." *Id.,* § 45.14 at 109–10.

¶ 43. Viewed against these background general principles, Wisconsin's statutory interpretation case law has evolved in something of a combination fashion, generating some analytical confusion. The typical statutory interpretation case will declare that the purpose of statutory interpretation is to discern and give effect to the intent of the legislature, but will proceed to recite principles of interpretation that are more readily

associated with a determination of statutory meaning rather than legislative intent—most notably, the plain-meaning rule. *See, e.g., State ex rel. Cramer v. Schwarz,* 2000 WI 86, ¶¶ 17–18, 236 Wis. 2d 473, 613 N.W.2d 591. Although ascertainment of legislative intent is the frequently-stated goal of statutory interpretation, our cases generally adhere to a methodology that relies primarily on intrinsic sources of statutory meaning and confines resort to extrinsic sources of legislative intent to cases in which the statutory language is ambiguous. *Id.; see also Seider v. O'Connell,* 2000 WI 76, ¶¶ 43–53, 236 Wis. 2d 211, 612 N.W.2d 659; *State v. Setagord,* 211 Wis. 2d 397, 406–07, 565 N.W.2d 506 (1997); *State v. Williams,* 198 Wis. 2d 516, 525–27, 544 N.W.2d 406 (1996); *State v. Martin,* 162 Wis. 2d 883, 893–94, 470 N.W.2d 900 (1991).

¶ 44. Accordingly, we now conclude that the general framework for statutory interpretation in Wisconsin requires some clarification. It is, of course, a solemn obligation of the judiciary to faithfully give effect to the laws enacted by the legislature, and to do so requires a determination of statutory meaning. Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute. We assume that the legislature's intent is expressed in the statutory language. Extrinsic evidence of legislative intent may become relevant to statutory interpretation in some circumstances, but is not the primary focus of inquiry. It is the enacted law, not the unenacted intent, that is binding on the public. Therefore, the purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect.

¶ 45. Thus, we have repeatedly held that statutory interpretation "begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." *Seider,* 236 Wis. 2d at 232; *see also Setagord,* 211 Wis. 2d at 406; *Williams,* 198 Wis. 2d at 525; *Martin,* 162 Wis. 2d at 893–94. Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning. *Bruno v. Milwaukee County,* 2003 WI 28, ¶¶ 8, 20, 260 Wis. 2d 633, 660 N.W.2d 656; *see also* Wis. Stat. § 990.01(1).

¶ 46. Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results. *State v. Delaney,* 2003 WI 9, ¶ 13, 259 Wis. 2d 77, 658 N.W.2d 416; *Landis v. Physicians Ins. Co. of Wis.,* 2001 WI 86, ¶ 16, 245 Wis. 2d 1, 628 N.W.2d 893; *Seider,* 236 Wis. 2d 211, ¶ 43. Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage. *Martin,* 162 Wis. 2d at 894; *Bruno,* 260 Wis. 2d 633, ¶ 24. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Bruno,* 260 Wis. 2d 633, ¶ 20. Where statutory language is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history. *Id.,* ¶ 7; *Cramer,* 236 Wis. 2d

663

473, ¶ 18; *Seider,* 236 Wis. 2d 211, ¶ 50; *Martin,* 162 Wis. 2d at 893–94. "In construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." *State v. Pratt,* 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967).

¶ 47. The test for ambiguity generally keeps the focus on the statutory language: a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses. *Bruno,* 260 Wis. 2d 633, ¶ 19; *Martin,* 162 Wis. 2d at 894. It is not enough that there is a disagreement about the statutory meaning; the test for ambiguity examines the language of the statute "to determine whether 'well-informed persons *should have* become confused,' that is, whether the statutory . . . language *reasonably* gives rise to different meanings." *Bruno,* 260 Wis. 2d 633, ¶ 21 (second emphasis added). "Statutory interpretation involves the ascertainment of meaning, not a search for ambiguity." *Id.,* ¶ 25.

¶ 48. At this point in the interpretive analysis the cases will often recite the following: "If a statute is ambiguous, the reviewing court turns to the scope, history, context, and purpose of the statute." *Cramer,* 236 Wis. 2d 473, ¶ 18; *Setagord,* 211 Wis. 2d at 406; *Williams,* 198 Wis. 2d at 525. Sometimes the cases substitute the phrase "subject matter and object of the statute" for the phrase "purpose of the statute" in this litany. *Ball v. Dist. No. 4, Area Bd. Of Vocational, Technical & Adult Educ.,* 117 Wis. 2d 529, 538, 345 N.W.2d 389 (1984). Either way, this common formulation is somewhat misleading: scope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope,

context, and purpose are ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history.

¶ 49. Some statutes contain explicit statements of legislative purpose or scope. A statute's purpose or scope may be readily apparent from its plain language or its relationship to surrounding or closely-related statutes—that is, from its context or the structure of the statute as a coherent whole. Many words have multiple dictionary definitions; the applicable definition depends upon the context in which the word is used. Accordingly, it cannot be correct to suggest, for example, that an examination of a statute's purpose or scope or context is completely off-limits unless there is ambiguity. It is certainly not inconsistent with the plain-meaning rule to consider the intrinsic context in which statutory language is used; a plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose.[8]

---

[8] In her concurrence the chief justice represents that "[t]his opinion correctly concludes that a court resorts to the scope, context, and purpose of the statute without having to declare an ambiguity in the statute." Concurrence of Chief Justice Abrahamson, ¶ 61. This somewhat overstates our holding. We have noted that a statute's scope, context, and purpose are often apparent from the statutory text itself. A plain meaning, text-based approach to statutory interpretation certainly does not prohibit the interpretation of a statute in light of its textually manifest scope, context, or purpose. We do not by this conclusion endorse the methodology advanced by the chief justice in her concurrence that calls for consultation of extrinsic, non-textual sources of interpretation in every case, regardless of whether the language of the statute is clear. Such an approach subordinates the statutory text and renders the analysis more vulnerable to subjectivity. We agree with the chief

¶ 50. What is clear, however, is that Wisconsin courts ordinarily do not consult extrinsic sources of statutory interpretation unless the language of the statute is ambiguous. By "extrinsic sources" we mean interpretive resources outside the statutory text—typically items of legislative history. *Sutherland,* § 45:14 at 109.

¶ 51. We have repeatedly emphasized that "traditionally, 'resort to legislative history is not appropriate in the absence of a finding of ambiguity.' " *Seider,* 236 Wis. 2d 211, ¶ 50 (quoting *State v. Sample,* 215 Wis. 2d 487, 495–96, 573 N.W.2d 187 (1998)) (quoting in turn, *Setagord,* 211 Wis. 2d at 406). This rule generally "prevents courts from tapping legislative history to show that an unambiguous statute is ambiguous." *Id.,* ¶ 51. That is, the rule prevents the use of extrinsic sources of interpretation to vary or contradict the plain meaning of a statute, ascertained by application of the foregoing principles of interpretation. Thus, as a general matter, legislative history need not be and is not consulted except to resolve an ambiguity in the statutory language, although legislative history is sometimes

justice's concurrence that our statutory interpretation cases have not been consistent. Accordingly, we here refocus the primary statutory interpretation inquiry on intrinsic, textual sources of statutory meaning and reiterate the rule that extrinsic sources of interpretation are generally not consulted unless there is a need to resolve an ambiguity in the statutory language. *See* ¶¶ 49–50, *infra.* In her concurrence the chief justice also represents that this opinion's restatement of the law of statutory interpretation is "in many respects similar" to the approach taken by the chief justice in certain recent cases. Concurrence of Chief Justice Abrahamson, ¶ 59 n.2. Again, this overstates the matter, for the reasons we have noted.

consulted to confirm or verify a plain-meaning interpretation. *Seider,* 236 Wis. 2d 211, ¶¶ 51–52.

¶ 52. Properly stated and understood, this approach to statutory interpretation is not literalistic, nor is it "conclusory" or "result-oriented" in application, as suggested by the chief justice's concurrence. Concurrence of Chief Justice Abrahamson, ¶ 63. An interpretive method that focuses on textual, intrinsic sources of statutory meaning and cabins the use of extrinsic sources of legislative intent is grounded in more than a mistrust of legislative history or cynicism about the capacity of the legislative or judicial processes to be manipulated. Concurrence of Chief Justice Abrahamson, ¶¶ 63, 66. The principles of statutory interpretation that we have restated here are rooted in and fundamental to the rule of law. Ours is "a government of laws not men," and "it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated." Antonin Scalia, *A Matter of Interpretation,* at 17 (Princeton University Press, 1997). "It is the *law* that governs, not the intent of the lawgiver. . . . Men may intend what they will; but it is only the laws that they enact which bind us."[9] *Id.*

---

[9] Professor Sunstein, whom the chief justice cites on the issue of legislative intent, *see* Concurrence of Chief Justice Abrahamson, ¶ 60 n.3, shares these concerns. In his article, *Interpreting Statutes in the Regulatory State,* Professor Sunstein draws a distinction between legislative history and "statutory background," the latter term referring to previously enacted and repealed statutory provisions. *See* Cass R. Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv. L. Rev. 405, 430. He notes the significance of Justice Scalia's concerns about the use of legislative history in statutory interpretation:

¶ 53. Applying these principles here, we conclude that the language of Wis. Stat. § 968.02(3) is clear and unambiguous. More particularly, the term "refuse" (as in "the district attorney refuses") has a common and accepted meaning, ascertainable by reference to the dictionary definition.

¶ 54. To refuse is "[t]o indicate unwillingness to do, accept, give, or allow." *The American Heritage Dictionary of the English Language* 1519 (3d ed. 1992). As the term is ordinarily understood, a "refusal" involves a decision to reject a certain choice or course of action. This definition is reasonable in the statutory context and consistent with the manifest statutory purpose. Accordingly, the statute's meaning is plain, there is no ambiguity to clarify, and no need to consult extrinsic sources such as legislative history.

¶ 55. This common and accepted definition implies more than mere inaction, but does not necessarily require an express statement from the district attorney. As with other elements of courtroom proof, a refusal under this statute may be proven directly or circum-

Concerns of this sort are both legitimate and well-taken. Although it is proper to look at a statute's background in the form of actually enacted and repealed provisions, the legislative history, which was never enacted, should rarely be permitted to supplant the statutory words as they are ordinarily understood. This is so because attention to the language promotes the rule of law and because of democratic and constitutional considerations—the words rather than the intent survived the procedures of article I.

*Id.* Thus, he urges caution regarding legislative history, generally justifying its use where the statutory language is ambiguous or results in an "unintended irrationality or injustice." *Id.* at 431.

stantially, by inferences reasonably drawn from words and conduct.[10] Thus, a refusal can be open and explicit, as in a statement to that effect, or it can be indirect and inferred, as in a long silence or period of inaction that, under the totality of circumstances, gives rise to a reasonable inference that the district attorney intends not to act. A period of inaction may well indicate an ongoing investigation or a pending charging decision by the district attorney; inaction alone will ordinarily not support an inference of a refusal to prosecute.

¶ 56. This plain-meaning interpretation of "refuses" preserves the hierarchy specified in the statute —the district attorney's charging authority is primary, the circuit judge's, secondary—and is reinforced by the Judicial Council Committee Note, which characterizes this subsection as a "check" on the district attorney's charging power.[11] See Wis. Stat. § 968.02(1) and (3); see also Judicial Council Committee Note, ¶ 35, *supra.* The statute's requirement of a prior refusal by the district attorney demonstrates that the procedure set forth in Wis. Stat. § 968.02(3) is not a routine substitute for the district attorney's exercise of discretion. On the other hand, a strict and literal interpretation, requiring an explicit statement of refusal from the district attorney,

---

[10] The district attorney receives notice of hearings under this statute and may appear before the judge: "If the district attorney has refused to issue a complaint, he or she shall be informed of the hearing and may attend." Wis. Stat. § 968.02(3). Determining the district attorney's precise position should ordinarily not be difficult.

[11] *See Seider v. O'Connell*, 2000 WI 76, ¶¶ 51–52, 236 Wis. 2d 211, 612 N.W.2d 659 (legislative history is sometimes consulted to reinforce a plain meaning interpretation of a statute).

as argued by the Kalals, is contrary to and could defeat the purpose of the statute. The district attorney could block the use of Wis. Stat. § 968.02(3) by simply responding to the complainant in vague and uncertain terms.

¶ 57. In this case, Tjader testified that she reported the alleged theft to the police in August 2001 and to the district attorney in November 2001, and that as of the date of the hearing, March 13, 2002, the district attorney had not filed charges, but, rather, had indicated to her that she was free to pursue whatever legal recourse she wished. Deputy District Attorney Hanson's statements were largely in agreement with Tjader's. While he admitted that his office had not affirmatively stated it would not prosecute, he made it clear that the district attorney's position was that the conduct of his office constituted a "refusal" under Wis. Stat. § 968.02(3) and that Tjader could pursue other remedies. Judge Finn's conclusion that these facts in their totality amounted to a refusal on the part of the district attorney is consistent with the plain-meaning interpretation of the statute. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 58. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I join the mandate, but I return once again to this court's approach(es) to statutory interpretation. It is important, as I have written before, that litigants,

lawyers, legislators, courts, and the people of Wisconsin know and understand our approach to legislative interpretation.[1]

¶ 59. This opinion makes what I consider a significant advance in explaining what the court is actually doing in statutory interpretation.[2] I think, however, it will be difficult to understand and apply parts of this opinion because it works at cross purposes in several respects. For example, the opinion strongly emphasizes textualism but broadens textualism to include many matters the plain meaning folk (including those on this court) have rejected. It recognizes that the purposes of the legislation should be considered in interpretation but refuses to consider the consequences of different interpretations as an aid to interpretation (but does consider the consequences right in this opinion).

¶ 60. The most significant advance is that the court at long last abandons its too-oft quoted but erroneous aphorism that to determine the intent of the

---

[1] *State v. Peters,* 2003 WI 88, ¶ 33, 263 Wis. 2d 475, 665 N.W.2d 171 (Abrahamson, C.J., concurring). For a discussion of statutory interpretation, see William D. Popkin, *Statutes in Court: The History and Theory of Statutory Interpretation* 151 et seq. (1999).

[2] The approach set forth in the opinion is in many respects similar to one I have set forth in majority opinions I have authored. One difference is that the opinions I authored state that a court may use "history" in interpreting a statute. *See, e.g., In re Commitment of Morford,* 2004 WI 5, ¶ 21, 268 Wis. 2d 300, 674 N.W.2d 349; *Highland Manor Assocs. v. Bast,* 2003 WI 152, ¶ 9, 268 Wis. 2d 1, 672 N.W.2d 709; *State v. Cole,* 2003 WI 59, ¶ 25, 262 Wis. 2d 167, 663 N.W.2d 700.

legislature[3] "if a statute is ambiguous, the reviewing court turns to the scope, history, context, and purpose of the statute."[4]

¶ 61. This opinion correctly concludes that a court resorts to the scope, context, and purpose of the statute without having to declare an ambiguity in the

---

[3] As I have written previously, *see In re Commitment of Byers,* 2003 WI 86, ¶ 48, 263 Wis. 2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring), this court has consistently and resolutely held that the purpose of statutory interpretation is to determine and give effect to the intent of the legislature in enacting a particular statute. It is, of course, a legal fiction to assert that there is an actual legislative "intent." *See, e.g.,* Daniel A. Farber & Philip P. Frickey, *Legislative Intent and Public Choice,* 74 Va. L. Rev. 423, 423 (1988). "It is impossible to argue that a legislative body actually has a collective, corporate intent that is somehow the sum of the individual, and often conflicting, intents of its members." Burt Neuborne, *Background Norms for Federal Statutory Interpretation,* 22 Conn. L. Rev. 721, 724 (1990).

Rather, discerning and giving effect to the "intent" of the legislature is an exercise in logic in which a court determines what a reasonable person in the position of a legislator enacting the statute would have said about the legal issue presented in a given case. Cass R. Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv. L. Rev. 405, 429 (1989) (arguing that searching for legislative intent does not involve looking for "a general legislative aim or purpose, but instead to see more particularly how the enacting legislature would have resolved the question, or how it intended that question to be resolved, if it had been presented.").

[4] *Wisconsin S. Gas Co. v. Public Serv. Comm'n,* 57 Wis. 2d 643, 205 N.W.2d 403 (1973). *See Hubbard v. Messer,* 2003 WI 145, ¶¶ 44–46, 267 Wis. 2d 92, 673 N.W.2d 676 (Roggensack, J., concurring, joined by Wilcox, J., and Crooks, J.) (objecting to my declaring that resort may be had to scope, context, history, and purpose without a declaration that the statute is ambiguous).

statute.[5] The majority opinion states: "[S]cope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history."[6] The trick in understanding and applying this sentence is to give meaning to the phrase "ascertainable from the text and

[5] Majority op., ¶ 48.

I add the word "history" to the list. *See also Byers,* 263 Wis. 2d 113, ¶¶ 45–47 (Abrahamson, C.J., concurring) (urging a similar statement); *Cole,* 262 Wis. 2d 167, ¶ 13 (court must ascertain the legislative intent from the language of the statute in relation to its context, history, scope, and objective intended to be accomplished, including the consequences of alternative interpretations).

So too can a court resort to canons of interpretation to determine the plain meaning. *See Peters,* 263 Wis. 2d 475, ¶¶ 27–28, 30 (Abrahamson, C.J., concurring) (discussing use of a canon of interpretation in contrast to the position taken by the majority opinion, authored by Justice Sykes, opposing use of a canon to determine plain meaning); *Chisom v. Roemer,* 501 U.S. 380, 404 (1991) (Scalia, J., dissenting) (using established canons of construction, the Court should ask whether there is a clear indication that some permissible meaning other than the ordinary one applies). *See also* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 25–27 (1997) (endorsing the use of canons of construction in a textualist approach).

In discussing *Sutherland's Statutes and Statutory Construction,* upon which the majority relies, Justice Scalia wrote: "[I]t is one of those law books that functions primarily not as a teacher or adviser, but as a litigator's research tool and expert witness—to say, and to lead you to cases that say, why the statute should be interpreted the way your client wants." *Id.* at 15.

[6] Majority op., ¶ 48.

structure of the statute itself." "Ascertainable," "text," and "structure of the statute itself" have elasticity. From my perspective that is a saving grace.

¶ 62. Our cases have been inconsistent in stating whether an ambiguity must be declared[7] before a court examines the terms of a statute in relation to the scope, history, context, and subject matter of the legislation, the spirit or nature of the act, the evil intended to be remedied, the general object sought to be accomplished, and the consequences.[8] The majority opinion now sepa-

---

[7] Compare, *e.g., Hughes v. Chrysler Motors Corp.,* 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996) (ambiguity not declared); *Kelley v. Marquardt,* 172 Wis. 2d 234, 247–48, 493 N.W.2d 68 (1992) (ambiguity declared); *Wisconsin S. Gas Co. v. Pub. Serv. Comm'n,* 57 Wis. 2d 643, 205 N.W.2d 403 (1973) (ambiguity not declared); *State ex rel. Klinger v. Baird,* 56 Wis. 2d 460, 465–66, 202 N.W.2d 31 (1972) (ambiguity declared); *Perry Creek Cranberry Corp. v. Hopkins Agric. Chem. Co.,* 29 Wis. 2d 429, 139 N.W.2d 96 (1966) (ambiguity not declared); *Scanlon v. Menasha,* 16 Wis. 2d 437, 442, 114 N.W.2d 791 (1962) (ambiguity not declared); *Worachek v. Stephenson Town School Dist.,* 270 Wis. 116, 120, 70 N.W.2d 657 (1955) (ambiguity not declared); *Mundt v. Sheboygan & Fond du Lac R.R. Co.,* 31 Wis. 451 (1872) (ambiguity declared).

[8] For cases examining the consequences of alternative interpretations to determine the correct statutory interpretation, *see, e.g.,* majority op., ¶ 56 ("This plain-meaning interpretation of 'refuses' preserves the hierarchy specified in the statute—the district attorney's charging authority is primary, the circuit judge's, secondary . . . . On the other hand, a strict and literal interpretation, requiring an explicit statement of refusal from the district attorney, as argued by the Kalals, is contrary to and could defeat the purpose of the statute."); *State ex rel. Labine v. Puckett,* 2004 WI 25, ¶ 7, 270 Wis. 2d 57, 676 N.W.2d 424 ("We agree with the parties that the determination of who is a 'prisoner' under the PLRA is an important question of statutory interpretation. Therefore, we conclude that we should address

rates "history" from the other listed sources of legislative intent, without defining history, and discusses only legislative history. Before a court uses legislative history, a court must declare the statute ambiguous, according to the majority opinion.

¶ 63. I part company with the majority opinion when it declares that extrinsic sources (not defined)[9] such as legislative history may be used only when the statutory language is ambiguous[10] or when the legislative history supports (but does not contradict) the plain meaning of the statute.[11] I have criticized this approach

that question when it is before this court in a case with adversary parties and with full briefing of the consequences of any statutory interpretation."); *Harrington v. Smith,* 28 Wis. 43, 59 (1871) (quoted at ¶ 71, *infra*).

Examining the consequences of alternative interpretations is another way of stating that in interpreting a statutory provision, unreasonable or absurd interpretations should be avoided and the purposes of the statute should be fulfilled.

[9] For a discussion of extrinsic and intrinsic sources, see *Juneau County v. Courthouse Employees, Local 1312,* 221 Wis. 2d 630, 642–43, 585 N.W.2d 587 (1998).

In *Landis v. Physicians Ins. Co. of Wis., Inc.,* 2001 WI 86 ¶ 15, 245 Wis. 2d 1, 628 N.W.2d 893, the court described "extrinsic factors [as] including the legislative object intended to be accomplished, and the statute's scope, history, context, and subject matter" (citation omitted).

[10] Majority op., ¶ 51.

[11] *Id.*

*See also State v. Martin,* 162 Wis. 2d 883, n.5, 470 N.W.2d 900 (1991) (court refuses to examine extrinsic sources if they contradict the plain language findings).

Justice Scalia, a textualist and an opponent of the use of federal legislative history, nevertheless allows the use of legislative history to avoid an absurd result. *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 527 (1989) (Scalia, J., concurring).

to plain meaning, ambiguity, and legislative history before.[12] Language is often ambiguous;[13] the distinction between "plain" and "ambiguous" is in the eye of the

When a student at the University of Washington Law School challenged Justice Scalia to tell the audience how he would interpret a particular constitutional provision whose plain meaning was obviously unacceptable, the Justice is reported to have said, "I'm a strict constructionist but I'm not a kook."

The New York Times reported that Justice Scalia was quick to assure an audience that he might not be prepared to follow all of his criticisms of constitutional interpretation to their logical conclusion. The justice commented, "I am a textualist. I am an originalist. I am not a nut." Adam Liptak, *In Re Scalia the Outspoken v. Scalia the Reserved,* The New York Times, May 2, 2004, at 27.

[12] *See, e.g., Byers,* 263 Wis. 2d 113, ¶¶ 45–57 (Abrahamson, C.J., concurring). Justice Scalia views such an inquiry as "not merely a waste of research time and ink" but as a "false and disruptive lesson in the law." *Conroy v. Aniskoff,* 507 U.S. 511, 519 (1993) (Scalia, J., concurring).

[13] *Byers,* 263 Wis. 2d 113, ¶ 52 (Abrahamson, C.J., concurring).

Interpretive problems arise from the inherent ambiguity of language as well as the limits of our linguistic capabilities. *State v. Sample,* 215 Wis. 2d 487, 510, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring). Justice Holmes, writing for a unanimous Court in *Towne v. Eisner,* 245 U.S. 418, 425 (1918), said: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

beholder;[14] and both words too often are conclusory labels a court pins on a statute, making its decision appear result-oriented.[15]

¶ 64. I have argued that a court may examine history without declaring an ambiguity[16] and that a court "must engage in an analysis of both the evidence that supports a given interpretation as well as the evidence that contradicts a given interpretation."[17]

¶ 65. The majority opinion does not attempt to define "history" or "extrinsic sources" other than by mentioning legislative history and does not attempt to explain what it means by legislative history as an extrinsic source.[18]

¶ 66. Legislative history, especially legislative committee reports and the congressional record, has gotten a bad reputation in recent years in federal circles because legislative history may be manufactured by both proponents and opponents of the legislation, and often every position can be buttressed by something in the federal legislative history.[19] Nevertheless, legisla-

---

[14] *Courthouse Employees, Local 1312*, 221 Wis. 2d at 642 n.8.

[15] *Byers*, 263 Wis. 2d 113, ¶ 50 n.10 (Abrahamson, C.J., concurring).

[16] *Fox v. Catholic Knights Ins. Soc'y.*, 2003 WI 87, ¶¶ 45–46, 263 Wis. 2d 207, 665 N.W.2d 181 (Abrahamson, C.J., concurring).

[17] *Id.*, ¶ 44 (Abrahamson, C.J., concurring).

[18] One commentator defines legislative history as "written materials pertaining to the legislation." *See* Kenneth R. Dortzbach, *Legislative History: The Philosophies of Justices Scalia and Breyer and the Use of Legislative History by the Wisconsin State Courts,* 80 Marq. L. Rev. 161, 162 n.1 (1996).

[19] *See, e.g.*, Dortzbach, *supra* note 18, at 190; Stephen Breyer, *On the Uses of Legislative History in Interpreting*

tive history that is well understood and carefully weighed can help a court understand a statute.[20]

¶ 67. Legislative history at the state level differs from federal legislative history. For one thing, there is a lot less legislative history in Wisconsin than at the federal level, and manufacturing of legislative history is a less well-known and less perfected skill here.

¶ 68. I write to alert the reader to the numerous forms of "history" this court has relied upon in past statutory interpretation cases, with and without a declaration of ambiguity, and to remind the reader that not all forms of "history" are legislative history or of equal value in determining the meaning of a statute.[21] Some types of history are further removed from the legislative process than others. My position is that history, including legislative history, can be one part of the mix in statutory interpretation.

¶ 69. Here is a nonexhaustive list of various forms of "history" that have been and will be helpful in interpreting a statute. The majority opinion appears to

---

*Statutes,* 65 S. Cal. L. Rev. 845, 845–46 (1992); Abner J. Mikva, *Statutory Interpretation: Getting the Law to be Less Common,* 50 Ohio St. L.J. 979, 981 (1989).

[20] Justice Scalia explains his using legislative history in interpreting statutes contrary to his textualist approach as follows: "I play the game like everybody else. . . . I'm in a system which has accepted rules and legislative history is used. You read my opinions, I sin with the rest of them." *Judges and Legislators: Toward Institutional Comity,* 174–75 (R. Katzmann ed. 1988) (Justice Scalia's comments during a panel discussion) (quoted in Frank H. Easterbrook, *What Does Legislative History Tell Us?,* 66 Chi.-Kent L. Rev. 441, 442 n.4 (1991)).

[21] *See Courthouse Employees, Local 1312,* 221 Wis. 2d at 642–43; *Ball v. Dist. No. 4,* 117 Wis. 2d 529, 544–45, 345 N.W.2d 389 (1984); Dortzbach, *supra* note 18, at 223.

set forth a global approach to statutory interpretation but is silent about use of the following sources of statutory interpretation:

1. **Nonstatutory Provisions**. The legislature often adopts provisions that appear in the session laws but not in the compiled statutes.[22] Nonstatutory provisions often set forth statements of legislative findings, intent, or purpose, or rules of construction.[23] These nonstatutory provisions have the force of law and aid the court in interpretation of statutes.[24]

2. **Statutory history**. An historical note appears in the Wisconsin Statutes after each statutory section, tracing its history since 1970.[25] History notes in the current volumes of the Wisconsin Statutes cover the period from 1971 to date. The Revisor of Statutes publishes a separate volume, Wisconsin Annotations, which contains a history

---

[22] These provisions appear in the annotated versions of the statutes. *See* West's Wisconsin Statues Annotated.

[23] *See, e.g.,* 1989 Wis. Act 105, § 1; 1995 Wis. Act 77, § 629; 1995 Wis. Act 290, § 17; 1995 Wis. Act 309, § 4; 1997 Wis. Act 188, § 191(8); 1999 Wis. Act 113, § 23.

The Legislative Reference Bureau discourages use of such provisions except under certain circumstances. Indeed a statement of legislative intent, purpose, or findings may not be included in a draft without the approval of the chief of the bureau. *See* Stephen R. Miller, Legislative Reference Bureau, *Wisconsin Bill Drafting Manual* § 7.11 (2003–04).

[24] A. Peter Cannon, Legislative Reference Bureau, *Guide to Researching Wisconsin Legislation* (1998). *See, e.g., Chernetski v. Am. Family Mut. Ins. Co.,* 183 Wis. 2d 68, 76, 515 N.W.2d 283 (Ct. App. 1994); *McLeod v. State,* 85 Wis. 2d 787, 792, 271 N.W.2d 157 (Ct. App. 1978).

[25] Cannon, *supra* note 24.

from 1848–1970.[26] By analyzing the changes the legislature has made over time, a court may infer intent.[27]

3. **Prefatory Notes (Analysis) to Bills.** Wisconsin Stat. § 13.92(1)(b)2 provides that the Legislative Reference Bureau (LRB) shall "prepare in plain language an analysis of each original measure, to be printed with the measure when it is introduced."[28] The purpose of the analysis is to clearly and objectively describe, in understandable language, the substance and effect of a legislative proposal so that legislators are adequately advised about the legal effect of the proposal.[29] The Prefatory Note (Analysis) is distributed to all legislators and appears in the bill jacket available at the LRB[30] and on microfiche at the State Law Library.[31] A court should use great care before relying on a Prefatory Note (Analysis) because the bill may be changed after the Note has been prepared. Notes are not

---

[26] *Id.* The history notes also appear in West's Wisconsin Statutes Annotated.

[27] *See, e.g., Byers,* 263 Wis. 2d 113, ¶ 22–27 (examined language changed by amendments to the original bill); *Hughes,* 197 Wis. 2d at 982–83 (tracked changes to the statute).

[28] Wis. Stat. § 13.92(1)(b)2. Analysis is required for: (1) all bill drafts, except preliminary drafts, (2) engrossed bills, engrossed joint resolutions, and engrossed resolutions when time permits, (3) joint resolutions affecting state or federal constitution or the joint rules, and (4) resolutions affecting house rules. Miller, *supra* note 23, § 4.03(1)(a)1–4.

[29] Miller, *supra* note 23, §4.03(2)(a).

[30] To communicate with the LRB, call (608) 266–0341 or e-mail LRB_Reference@legis.state.wi.us.

[31] Information about the State Law Library is available on its website: http://www.wsll.state.wi.us.

prepared or updated for amendments. Courts have relied on this useful history.[32]

4. **Judicial Council Materials**. The Judicial Council was created in 1951.[33] It drafts rules for the court and laws for the legislature. The Judicial Council notes appear with the text of the rules and laws in the Wisconsin Statutes,[34] but neither the court nor the legislature ordinarily adopts the Notes as part of the statute or rule.[35]

---

[32] *See, e.g., Seider v. O'Connell*, 2000 WI 76, ¶ 57, 236 Wis. 2d 211, 612 N.W.2d 659; *McDonough v. DWD*, 227 Wis. 2d 271, 280, 595 N.W.2d 686 (1999); *Chernetski*, 182 Wis. 2d at 76 n.3. For other cases citing Prefatory Notes, see Miller, *supra* note 23, §4.03(2)(f).

[33] The legislature created the judicial council to

[o]bserve and study the rules of pleading, practice and procedure, and advise the supreme court as to changes which will, in the council's judgment, simplify procedure and promote a speedy determination of litigation upon its merits. Make a continuous survey and study of the organization, jurisdiction and methods of administration and operation of all the courts of the state, both courts of record and others, the volume and condition of business in said courts, the work accomplished and the results obtained. Collect, compile, analyze and publish judicial statistics. Receive, consider and in its discretion investigate suggestions from any source pertaining to the administration of justice and to make recommendations. Keep advised concerning the decisions of the courts relating to the procedure and practice therein and concerning pending legislation affecting the organization, jurisdiction, operation, procedure and practice of the courts. Recommend to the legislature any changes in the organization, jurisdiction, operation and methods of conducting the business of the courts which can be put into effect only by legislative action.

Ch. 392, Laws of 1951.

[34] *See, e.g.,* Wis. Stat. §§ 19.97, 30.30, 102.23, 345.315, 751.03, 752.31, 755.17.

[35] *See, e.g., Wisconsin Rules of Evidence,* 59 Wis. 2d R1, R2.

Courts have used the Notes to aid in interpretation of a statute.[36] Materials generated by the Judicial Council beyond the Notes are available at the State Law Library, the State Historical Society, and the Legislative Reference Bureau and on web sites.[37]

5. **Joint Legislative Council Materials**. The Joint Legislative Council was created in 1947.[38] It consists of legislators[39] and functions through study committees that include legislators and public members.[40] The study committees investigate various subject areas at the request of the legislature or the Council, and offer their recommendations in bill form to the Council.[41] The Council proposes legislation to the legislature.[42]

---

[36] *See, e.g.,* majority op., ¶ 35; *State v. Bodoh,* 226 Wis. 2d 718, 726, 595 N.W.2d 330 (1999) (examining the judicial council committee note to 1987 S.B. 191, Wis. Stat. Ann. § 940.24 (West 1996)).

[37] *See* http://wsll.state.wi.us/judcoun/judcouall.html (index to State Law Library's collection). The Judicial Council materials at the State Law Library include a wealth of information. *See* http://wsll.state.wi.us/judcoun/jc1overview.html (overview of Judicial Council).

[38] Ch. 444, Laws of 1947; Wis. Stat. § 13.81 (2001–02) (originally named the Legislative Council).

[39] The Joint Legislative Council consists of the leadership of both houses and 10 members selected by the membership of both houses.

[40] The study committees appointed by the Joint Legislative Council are made up of legislators and citizens who are interested in or knowledgeable about the study topic. For more information, visit the Joint Legislative Council's website at http://www.legis.state.wi.us/lc/facts.htm.

[41] Cannon, *supra* note 24.

[42] *Id.*

When proposing legislation, the Joint Legislative Council typically includes explanatory notes in the bill. These notes are often available in Wisconsin Statutes.[43] Courts rely upon the Council's explanatory notes when examining history.[44] Materials produced by the Joint Legislative Council and its committees, in addition to the Notes, including minutes of the meetings and summaries of testimony, are available at the office of the Joint Legislative Council, the Legislative Reference Bureau, and the State Historical Society in Madison. The staff of the Joint Legislative Council also prepares information bulletins that are available at the LRB.[45]

6. **Legislative Committee Records**. In addition to the committees that report to the Joint Legislative Council, various legislative committees hold hearings and propose legislation. The committees do not keep verbatim or summary records of committee deliberations or testimony presented. The Legislative Council collects the materials submitted to these committees and keeps the materials in its office in Madison.[46] Committee materials may also be deposited at

---

[43] *Id.*

*See, e.g.,* Wis. Stat. §§ 34.01, 67.10, 84.30, 107.35, 112.08, 168.04, 182.70, 340.01, 611.51.

[44] *See, e.g., Wagner v. Milwaukee County Election Comm'n,* 2003 WI 103, ¶¶ 38–39, 263 Wis. 2d 709, 666 N.W.2d 816.

[45] Visit the Legislative Reference Bureau's website at http://www.legis.state.wi.us/lrb/pubs/infobull.htm

[46] Joint Legislative Council, 1 E. Main St., Suite 401, Madison, WI 53703, (608) 266–1304.

the Wisconsin Historical Society, and the Historical Society may also have papers deposited by individual legislators.[47]

7. **Records of Special Legislative Committees**. At times the legislature creates special study committees to propose legislation. These committees may have published reports and documents available for public inspection which this court has used in statutory interpretation.[48]

8. **Bill Drafting Records**. Each bill, resolution, and joint resolution introduced since 1927 has its own drafting record. A drafting record contains all written materials, letters, and memoranda given to or created by a legislative drafting attorney in the process of drafting a bill, resolution, or subsequent amendment.[49] Although the drafting records are by-products of the drafting process and are not designed to document legislative intent, the records may indicate legislative intent, and bill drafting records, including the fiscal impact statements,[50] have often been used

---

[47] Visit the State Historical Society's website at http://wisconsinhistory.org.

[48] Visit the Legislative Council's website at http://www.legis.state.wi.us/lc/publications.htm. *See* 1997 Wis. Act 283 § 454 (creating the Criminal Penalties Study Committee). The State of Wisconsin Criminal Penalties Study Committee Report is available at http://www.doa.state.wi.us/docs_view 2.asp?docid=42.

Courts have relied on this report. *See, e.g., State v. Jackson,* 2004 WI 29, ¶¶ 22–24, 270 Wis. 2d 113, 676 N.W.2d 872; *State v. Volk,* 2002 WI App 274, ¶¶ 40–42, 258 Wis. 2d 584, 654 N.W.2d 24.

[49] Cannon, *supra* note 24.

[50] *See, e.g., Byers,* 263 Wis. 2d 113, ¶ 28.

by courts.[51] Bill drafting records are available on microfiche at the LRB, the State Law Library, and the State Historical Society in Madison, and the Milwaukee Public Library and the Marquette University Law Library in Milwaukee.[52] The staff of the LRB also prepares very helpful information bulletins that are available at the LRB.[53]

9. **Legislative Journals.** Each house publishes its own journal that provides a procedural record of legislative action including roll call votes, messages from the governor, and occasionally, other communications. Wis. Stat. § 13.17. The journals are organized by date. The journals can be found in the LRB library collection for legislative sessions since the territorial period.[54]

10. **Bulletin of Proceedings.** The Bulletin of Proceedings of the Wisconsin Legislature contains procedural histories for all introduced proposals, a subject index, and a listing of the statutory sections affected by the session laws.[55] The Bulletin is organized by bill number and is available in the LRB library collection.[56]

---

[51] *See, e.g., Hubbard v. Messer,* 2003 WI 145, ¶ 26 n.17, 267 Wis. 2d 92, 673 N.W.2d 676 (relied on drafting record); *Byers,* 263 Wis. 2d 113, ¶ 29 (examined drafting instructions to support the interpretation).

[52] Cannon, *supra* note 24.

[53] Visit the Legislative Reference Bureau's website: http://www.legis.state.wi.us/lrb/pubs/infobull.htm

[54] Cannon, *supra* note 24.

[55] *Id.*

[56] In the early years of the state, the Bulletin was called the "Index" and was printed as an appendix to the Journal.

11. **Governor's Study Committees**. The Governor may create a committee on a particular subject to make recommendations and to draft proposed legislation necessary to implement those recommendations.[57] The LRB and the State Historical Society catalog materials published by state agencies, including reports of governors' task forces and committees.[58] Courts have considered these reports in determining legislative intent.[59]

12. **Governor's Veto Message**. If the governor vetoes a bill, the governor must:

[R]eturn the bill, together with the objections in writing, to the house in which the bill originated. The house of origin shall enter the objections at large upon the journal and proceed to reconsider the bill.[60] Wisconsin courts have considered the veto message when examining the meaning of a statute.[61]

13. **Cases Interpreting the Statute.** Courts have often referred to prior cases interpreting the statute.

---

[57] For an example of a Governor's study committee report, *see, e.g.,* Citizens Study Committee on Judicial Organization, *Report to Governor Patrick Lucey* (1973).

[58] Cannon, *supra* note 24.

[59] The court relied upon the Report of the Citizens Study Committee on Judicial Organization in *In re C.M.B.,* 165 Wis. 2d 703, 711, 478 N.W.2d 385 (1992).

[60] Wis. Const. Art. V, § 10(2).

[61] *See, e.g., Courthouse Employees, Local 1312,* 221 Wis. 2d at 646; *Wis. Patients Comp. Fund v. St. Paul Fire & Marine Ins. Co.,* 116 Wis. 2d 537, 546, 342 N.W.2d 693 (1984); *In re Paternity of C.A.S.,* 156 Wis. 2d 446, 460, 456 N.W.2d 899 (Ct. App. 1990).

¶ 70. I agree with the approach the Canadian courts take. In *Ontario (Ministry of Labour) v. Hamilton,* [2002] 58 O.R.3d 37, ¶ 18, the court of appeal for Ontario wrote as follows:

> The modern approach to statutory interpretation calls on the court to interpret a legislative provision in its total context. The court should consider and take into account all relevant and admissible indicators of legislative meaning. The court's interpretation should comply with the legislative text, promote the legislative purpose, reflect the legislature's intent, and produce a reasonable and just meaning . . . . The Supreme Court has repeatedly affirmed this approach to statutory interpretation . . . .

This approach is supported by *Bapoo v. Co-Operators General Ins. Co.,* [1997] 36 O.R.3d 616, ¶ 8, where the court of appeal for Ontario wrote as follows:

> The court's interpretation should comply with the legislative text, promote the legislative purpose and produce a reasonable and just meaning. Professor Sullivan described the modern approach in the following passage:

> "There is only one rule in modern interpretation, namely, courts are obliged to determine the meaning of legislation in its total context, having regard to the purpose of the legislation, the consequences of proposed interpretations, the presumptions and special rules of interpretation, as well as admissible external aids. In other words, the courts must consider and take into account all relevant and admissible indicators of legislative meaning. After taking these into account, the court must then adopt an interpretation that is appropriate. An appropriate interpretation is one that can be justified in terms if (a) its plausibility, that is, its compliance with legislative text; (b) its efficacy, that is, its promotion of the legislative purpose; (c) its accept-

ability, that is, the outcome is reasonable and just." (internal citations omitted).

The Supreme Court of Canada repeatedly endorses this approach. It did so recently in *R. v. Glandue,* [1999] 1 S.C.R. 688, 706, where it wrote:

> As this court has frequently stated the proper construction of a statutory provision flows from reading the words of the provision in their grammatical and ordinary sense and in their entire context, harmoniously with the scheme of the statute as a whole, the purpose of the statute, and the intention of Parliament. The purpose of the statute and the intention of Parliament, in particular, are to be determined on the basis of intrinsic and admissible extrinsic sources regarding the Act's legislative history and the context of its enactment . . . .

¶ 71. My view is that "proper statutory interpretation requires that a court take a comprehensive view toward determining legislative intent."[62]

¶ 72. This approach is not new. It is based on Wisconsin precedent. This court stated in 1871 that the plain meaning rule is part of a broader, more comprehensive view toward statutory interpretation. The court explained:

---

[62] *Byers,* 263 Wis. 2d 113, ¶ 50 (Abrahamson, C.J., concurring). *See also Peters,* 263 Wis. 2d 475, ¶ 34 (Abrahamson, C.J., concurring); *State v. Davison,* 2003 WI 89, 263 Wis. 2d 145, 666 N.W.2d 1 (Abrahamson, C.J., concurring); *Cole,* 2003 WI 59, 262 Wis. 2d 167, 663 N.W.2d 700; *Courthouse Employees, Local 1312,* 221 Wis. 2d at 641–51; *State v. Sample,* 215 Wis. 2d 487, 510, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring); *State v. Stoehr,* 134 Wis. 2d 66, 77–82, 396 N.W.2d 177 (1986); *Milwaukee County v. DILHR,* 80 Wis. 2d 445, 451, 456, 259 N.W.2d 118 (1977).

> [T]he true rule for the construction of statutes is, to look at the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law, and thus, to ascertain the *true* meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words.[63]

Without this comprehensive approach, this court risks usurping the legislative role and substituting its judgment for the legislature's intent. It is only through complete analysis and weighing of available materials that we can ascertain the meaning of a statute and effectuate legislative intent.

¶ 73. For the reasons set forth above, I write separately to discuss statutory interpretation.

¶ 74. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that the applicable standards for a supervisory writ have not been established. I also agree that the district attorney's actions constituted a "refusal" under Wis. Stat. § 968.02(3). However, I write separately because of the competing discussions of statutory interpretation. Although I commend both the majority and concurrence for their endeavors, I ultimately join neither.

---

[63] *Harrington,* 28 Wis. at 59 (1871).