# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP221 |
| COMPLETE TITLE: | Dow Family, LLC, |
| | Plaintiff-Appellant-Petitioner, |
| | v. |
| | PHH Mortgage Corporation, |
| | Defendant-Respondent, |
| | U.S. Bank, N.A., |
| | Defendant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 350 Wis. 2d 411, 838 N.W.2d 119
(Ct. App. 2013 – Published)
PDC No: 2013 WI App 114

| | |
|---|---|
| OPINION FILED: | July 10, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 19, 2014 |

SOURCE OF APPEAL:

| | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Barron |
| JUDGE: | James D. Babbitt |

JUSTICES:

| | |
|---|---|
| CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
| DISSENTED: | |
| NOT PARTICIPATING: | BRADLEY, J., did not participate. |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs by *Joe Thrasher* and *Thrasher, Pelish, Franti & Heaney, Ltd.*, Rice Lake, and oral argument by *Joe Thrasher*.

For the defendant-respondent, there was a brief by *Mary Sue Anderson* and *Mallery & Zimmerman, S.C.*, Wausau, and oral argument by *Mary Sue Anderson*.

An amicus curiae brief was filed by *John E. Knight*, *Kirsten E. Spira*, and *Boardman & Clark LLP*, Madison, on behalf of

Wisconsin Bankers Association, and oral argument by *John E. Knight*.

An amicus curiae brief was filed by *Michael B. Apfeld* and *Godfrey & Kahn, S.C.*, Milwaukee; and *Robert J. Pratte* and *Fulbright & Jaworski LLP*, Minneapolis, on behalf of Mortgage Electronic Registration Systems, Inc.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP221
(L.C. No. 2010CV355)

STATE OF WISCONSIN    :    IN SUPREME COURT

**Dow Family, LLC,**

       **Plaintiff-Appellant-Petitioner,**

  **v.**

**PHH Mortgage Corporation,**

       **Defendant-Respondent,**

**U.S. Bank, N.A.,**

       **Defendant.**

**FILED**

**JUL 10, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed and cause remanded to the circuit court.*

¶1 N. PATRICK CROOKS, J. In 2009, Dow Family, LLC, (Dow) purchased a condominium located at unit four in the Island of Happy Days Condominiums. Unfortunately, the purchase did not result in happy days for Dow because PHH Mortgage Corporation (PHH) asserted that the condominium remained burdened by a mortgage after closing. Dow asks this court to find that the outstanding mortgage is unenforceable. Specifically, Dow argues

that even if PHH can prove it holds the underlying note in question, it does not follow that PHH also holds the mortgage, which would give PHH the right to bring a foreclosure action in regard to the property to satisfy any outstanding debts.

¶2 At the time of purchase, Dow satisfied a mortgage from 2003. Before closing, Dow also inquired about another mortgage from 2001 that was listed on the title commitment. The sellers' attorney informed Dow that the 2001 mortgage was mistakenly listed on the title commitment. This information, however, was incorrect because the 2001 mortgage, purportedly owed to PHH, did exist and went unsatisfied at the time of closing.

¶3 Dow sought declaratory judgment that the 2001 mortgage did not constitute a lien on the property at the time of the 2009 sale. Dow's position is that the statute of frauds requires written documentation of mortgage assignments. Specifically, Dow asserts that PHH is unable to produce documentation indicating that the mortgage was assigned to PHH at the time of closing. Therefore, Dow argues the 2001 mortgage was not an enforceable lien at the time it purchased the condominium in 2009. After PHH initiated a foreclosure action against Dow, the circuit court consolidated the two cases.

¶4 We are asked to determine whether PHH could properly enforce the 2001 mortgage at the time Dow purchased the property in 2009. PHH argues 1) that it received the applicable note by assignment in 2001, and 2) that it also held the mortgage at the time of the 2009 sale because, under the doctrine of equitable assignment, the mortgage follows the note. To evaluate PHH's

argument we must determine whether the doctrine of equitable assignment exists in Wisconsin. We must then determine whether that doctrine exempts mortgage assignments from the statute of frauds.

¶5 We agree with the circuit court and the court of appeals that the doctrine of equitable assignment is alive and well in Wisconsin. The doctrine's existence is evidenced in our case law, and we are convinced that the case law we rely upon should not be distinguished or discredited due to its age or changes in banking practices. We further conclude that the language of Wis. Stat. § 409.203(7) (2011-12),[1] which governs liens securing the right to payment, codifies equitable assignment. Finally, the application of equitable assignment in this case results in no unfairness to Dow.

¶6 We further hold that the doctrine of equitable assignment does not conflict with the statute of frauds outlined in Wis. Stat. § 706.02. Equitable assignment occurs by operation of law, which satisfies Wis. Stat. § 706.001(2)(a),[2] a statutory exception to the statute of frauds.

---

[1] All references to the Wisconsin statutes are to the 2011-12 version unless otherwise indicated. Wisconsin Stat. § 409.203(7) governs "Lien securing right to payment." It provides, "The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest, mortgage, or other lien." Wis. Stat. § 409.203(7).

[2] Wisconsin Stat. § 706.001(2)(a) excludes transfers of land from the statute of frauds when the land transaction occurs "[b]y act or operation of law."

3

¶7 Therefore, under the doctrine of equitable assignment, we hold that a mortgage automatically passes by operation of law upon the assignment of a mortgage note, which, as we noted above, satisfies a statutory exception to the statute of frauds. Accordingly, we affirm the court of appeals decision, which affirmed the circuit court, in part, reversed in part, and remanded the cause. Like both the circuit court and court of appeals, we conclude that the doctrine of equitable assignment applies and does not violate the statute of frauds; however, the issue of whether PHH has the necessary documents to enforce the note in question must be determined by the circuit court.

## I. PROCEDURAL BACKGROUND

¶8 The circuit court ruled in favor of PHH and held that "there is no material issue of fact as to PHH holding the note and thereby getting the mortgage equitably assigned to them." This ruling from the bench by the Barron County Circuit Court, Honorable James D. Babbitt presiding, followed arguments on PHH's summary judgment motion. The circuit court held that the doctrine of equitable assignment is alive and well in Wisconsin and that PHH possessed the underlying note. Therefore, it concluded that under the doctrine of equitable assignment, the 2001 mortgage was equitably assigned to PHH when it received the note in 2001. Because the 2001 mortgage remained unsatisfied at the time of the 2009 sale, foreclosure in favor of PHH was appropriate. Accordingly, the circuit court granted PHH's motion for summary judgment. The circuit court later issued its

4

written findings of fact, conclusions of law, and judgment of foreclosure.

¶9 We now review a published court of appeals decision that affirmed the circuit court in part, reversed in part, and remanded for further proceedings. Dow Family, LLC v. PHH Mortg. Corp., 2013 WI App 114, ¶2, 350 Wis. 2d 411, 838 N.W.2d 119. The court of appeals, relying on Tidioute Sav. Bank v. Libbey, 101 Wis. 193, 77 N.W. 182 (1898), Tobin v. Tobin, 139 Wis. 494, 121 N.W. 144 (1909), Muldowney v. McCoy Hotel Co., 223 Wis. 62, 269 N.W. 655 (1936), and Wis. Stat. § 409.203(7), agreed with the circuit court that the doctrine of equitable assignment applies in Wisconsin. Dow Family, LLC, 350 Wis. 2d 411, ¶¶26-37. It further held that application of equitable assignment did not conflict with the statute of frauds outlined in Wis. Stat. § 706.02. Id., ¶38. It held that because the mortgage was equitably assigned to PHH by virtue of PHH holding the note, the transfer of the mortgage occurred by operation of law, which is an exception to the statute of frauds. Id.; see also Wis. Stat. § 706.02(2)(a).

¶10 The court of appeals, however, found that the circuit court erred in granting summary judgment to PHH because PHH failed to show that it could enforce the note. Dow Family, LLC, 350 Wis. 2d 411, ¶24. Specifically, the court of appeals concluded that PHH's documentation at summary judgment did not show that it held an authenticated copy of the note in question. Id. Furthermore, the court of appeals held that PHH's arguments as to whether the note could be considered self-authenticating

5

were undeveloped, and it declined to address those arguments. Id., ¶22. Therefore, the court of appeals reversed and remanded for trial on the issue of PHH's ability to enforce the note in question.[3] Id., ¶24.

¶11 Dow appeals, arguing that even if the doctrine of equitable assignment exists in Wisconsin, a point that it does not concede, the doctrine cannot serve as an exception to the statute of frauds, which it argues requires that mortgage assignments be done in writing. Dow further contends that because the statute of frauds cannot be overcome by the doctrine of equitable assignment, no enforceable lien existed when Dow purchased the condominium in question; therefore, Dow asserts that PHH cannot foreclose on the property.[4]

## II. FACTUAL BACKGROUND

¶12 In 2001, U.S. Bank loaned William E. Sullivan and Jo Y. Sullivan $146,250. A note dated May 17, 2001, which lists

---

[3] PHH did not appeal the portion of the court of appeals' decision that reversed the circuit court and remanded the cause. Therefore, the issue of whether PHH can produce and enforce an authenticated copy of the note in question is not before this court.

[4] If this court were to decide that the doctrine of equitable assignment does not apply, Dow asks this court to decide two additional issues. First, Dow asks the court to hold that it took the property in question free and clear of the 2001 mortgage. Second, Dow asks whether its good faith in purchasing the property is relevant to PHH's ability to foreclose on the property. Because we conclude that equitable assignment applies and is not in conflict with the statute of frauds, we do not address Dow's additional arguments.

6

U.S. Bank as the lender and the Sullivans as the borrowers evidences this transaction.

¶13 The 2001 note is secured by a mortgage on a condominium located at unit four, Island of Happy Days, Mikana, Wisconsin, in Barron County. The mortgage documentation is dated May 17, 2001, and explicitly references the above-described 2001 note. The mortgage lists the Sullivans as the borrower/mortgagor and U.S. Bank as the lender. The mortgage also lists the Mortgage Electronic Registration System (MERS)[5] as both the nominee for U.S. Bank and the mortgagee.[6] The mortgage was recorded with the Barron County Register of Deeds on June

---

[5] Generally speaking,

> Mortgage Electronic Registration Systems, Inc., commonly known as MERS, is a corporation registered in Delaware and headquartered in the Virginia suburbs of Washington, D.C. MERS operates a computer database designed to track servicing and ownership rights of mortgage loans anywhere in the United States. Originators and secondary market players pay membership dues and per-transaction fees to MERS in exchange for the right to use and access MERS records.

Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1361 (2010).

[6] It is unclear to us how MERS can act as both a nominee of U.S. Bank and as the mortgagee. See Peterson, supra note 5, at 1374-75 (explaining that MERS cannot act as "both an agent and a principal with respect to the same property right"). To resolve the narrow questions before us, we need not determine whether the dual role of MERS is proper.

22, 2001. PHH asserts that it received an assignment of the 2001 note shortly after it came into existence.[7]

¶14    In 2009, Dow purchased the condominium at issue[8] from the Sullivans. Prior to the purchase, Dow obtained a title commitment that indicated that the property in question was subject to the above-described 2001 mortgage as well as a 2003 mortgage in the amount of $140,000.[9] The title commitment

---

[7] This court takes no position on whether PHH received an assignment of the note or whether PHH holds an authenticated copy of the note. However, the record contains a "notice of assignment, sale, or transfer of servicing rights" signed by the Sullivans. The notice states, "You are hearby notified that the servicing of your mortgage loan . . . is being assigned, sold or transferred from U.S. Bank, N.A. to PHH Mortgage Services, effective immediately following the closing of your loan." This notice is undated except for an electronic date stamp that appears to read May 11, 2001; therefore, the document may refer to the 2001 note.

The record also contains a copy of the 2001 note that includes an undated endorsement in blank to Cendant Mortgage Corporation, d/b/a PHH Mortgage Services Corporation. Finally, the record contains a copy of a letter dated November 24, 2009, which PHH's counsel sent to Dow's attorney. In regard to the 2001 note, the letter states,

> A copy of the assignment of the Note and Mortgage from USBank to MERS has not yet been located. However, our records clearly evidence that the Note and Mortgage were assigned into MERS and are now owned by Fannie Mae. PHH has serviced the loan since 2001 in the name PHH Mortgage Corporation.

[8] Dow's purchase of the condominium was one part of a larger transaction; however, only the sale of unit four is at issue here.

[9] The title commitment also evidenced a third mortgage, which is not at issue.

8

documentation listed U.S. Bank as the lender for both the 2001 and 2003 mortgages.[10]

¶15 Prior to closing, Dow's attorney contacted the Sullivans' attorney to inquire about the 2001 mortgage. Email correspondence between the attorneys indicates that William Sullivan represented that the 2001 mortgage should no longer be on the title and that the 2001 mortgage was the same as the 2003 mortgage. Dow apparently relied on this information to conclude that the 2003 mortgage evidenced a refinancing of the note that underlay the 2001 mortgage. Closing documents reflect that Dow satisfied a single mortgage to U.S. Bank in the amount of $143,140.89.

¶16 On November 24, 2009, PHH's counsel informed Dow's attorney that the 2001 note, serviced by PHH, remained outstanding and delinquent and that PHH would commence a foreclosure action if necessary. On June 23, 2010, Dow filed suit against PHH and U.S. Bank seeking a declaratory judgment that it purchased the condominium free and clear of the 2001 mortgage. On August 9, 2010, PHH initiated a foreclosure action against Dow. On February 1, 2011, Dow and PHH stipulated to the consolidation of the two cases.

¶17 Questions about the assignment, location of, and authenticity of the 2001 note are not before this court. Instead, we are asked to determine whether the doctrine of

---

[10] Dow asserts that the title commitment should have indicated that MERS was the mortgagee under the 2001 mortgage rather than U.S. Bank.

equitable assignment applies in Wisconsin. We first consider this question before discussing whether the doctrine of equitable assignment constitutes an exception to the statute of frauds.

### III. STANDARD OF REVIEW AND PRINCIPLES OF INTERPRETATION

¶18 Whether or not the doctrine of equitable assignment exists in Wisconsin is a question of law. This court reviews questions of law de novo. D.S.P. v. State, 166 Wis. 2d 464, 471, 480 N.W.2d 234 (1992).

¶19 The question of whether the doctrine of equitable assignment violates the statute of frauds requires statutory interpretation. "Statutory interpretation is a question of law for our independent review; however, we benefit from the discussions of the court of appeals and the circuit court." Kroner v. Oneida Seven Generations Corp, 2012 WI 88, ¶78, 342 Wis. 2d 626, 819 N.W.2d 264.

¶20 When conducting statutory interpretation we first look to the plain language of the statute. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We consider extrinsic sources to determine statutory meaning only when the plain language of the statute could reasonably be interpreted in more than one way. Id., ¶¶46-47.

### IV. ANALYSIS

### A. EQUITABLE ASSIGNMENT

¶21 Under the doctrine of equitable assignment, the assignment of a mortgage note is automatically followed by the

mortgage. Dow's arguments regarding equitable assignment are intertwined with its arguments regarding the statute of frauds, which we address in turn. However, Dow specifically questions references to equitable assignment in Wisconsin's common law, which it asserts are outdated and distinguishable.

¶22 PHH counters that equitable assignment is alive in Wisconsin as evidenced by established case law. PHH also asserts that Wis. Stat. § 409.203(7) codifies the doctrine of equitable assignment. Finally, PHH contends that the application of equitable assignment results in no unfairness to mortgagors.

¶23 We agree with both the circuit court and the court of appeals that the doctrine of equitable assignment is alive and well in Wisconsin. We also agree with the court of appeals' reliance on both case law and Wis. Stat. § 409.203(7) as evidence of the doctrine's existence and application in Wisconsin.

¶24 Evidence of the doctrine of equitable assignment exists in Wisconsin case law dating back to at least 1859. In Croft v. Bunster, 9 Wis. 503 (1859),[11] a case involving real estate transfers that were encumbered by mortgages, this court stated,

> The debt is the principal thing, the mortgage the incident; the transfer of the debt carries with it the mortgage. It is the debt which gives character to the

---

[11] Both WestLaw and Lexis use 9 Wis. 503 as the citation for Croft v. Bunster; however, the case appears at 9 Wis. 457 in the Wisconsin Reports, published by Callaghan & Company.

> mortgage, and fixes the rights and remedies of the parties under it, and not the mortgage which determines the nature of the debt. It cannot be contended that the securing of a negotiable instrument by a mortgage, destroys its negotiable character. We are of opinion, therefore, that both principle and sound policy require that the rights and remedies of an assignee, under the mortgage, should be co-extensive with those which he has under the instrument securing the debt.

Croft, 9 Wis. at 511.[12] While the same party in Croft appears to have held both the mortgage and the note, see id. at 506, this fact does not discredit the court's early recognition of the idea of equitable assignment.

¶25 In addition to Croft, Tidioute, 101 Wis. 193, Tobin, 139 Wis. 494, and Muldowney, 223 Wis. 62, support the existence and application of equitable assignment in Wisconsin, as the court of appeals recognized. See Dow Family, LLC, 350 Wis. 2d 411, ¶¶26-37. In Tidioute, Libbey, the defendant, secured two notes held by W.T. Richards & Co., who later sold each note to a different bank. Tidioute, 101 Wis. at 193-95. "[N]o formal assignment of the defendants' guaranty was made in either case." Id. at 195. While the issue in this case specifically addressed the distinction between a general guaranty and a special guaranty to determine whether the defendant could be held accountable to the current holders of the notes in question, the

---

[12] Croft utilizes a lengthy quotation from Mathews v. Wallwyn, 4 Vesey 118 (1798), an English case. It appears to rely on Mathews as the origin of equitable assignment. However, the conclusion of this quotation is unclear as the Croft opinion fails to include closing quotation marks. Reference to the text of Mathews v. Wallwyn itself confirms that the quotation we cite is from Croft and not from Mathews.

12

case gives ample support for the doctrine of equitable assignment. The court stated,

> A guaranty is defined to be "a separate, independent contract, by which the guarantor undertakes, for a valuable consideration, to be answerable for the payment of some particular debt, or future debts, or the performance of some duty, in case of the failure of another person primarily liable to pay or perform;" and it is said that such guaranty is assignable, with the obligation secured thereby, and that it goes with the principal obligation, and is enforceable by the same persons who can enforce that. The rule is that the transfer of a note carries with it all security without any formal assignment or delivery, or even mention of the latter.

Id. at 196 (citations omitted). The court further explained,

> The transfer of these notes to the plaintiffs carried with it, by operation of law, all securities for their payment. The debt is the principal thing, and the securities are only an incident. The transfer of the former, therefore, carries with it the right to the securities, and amounts to an equitable assignment of them. No matter what the form of the security is, whether a real-estate or chattel mortgage, or a pledge of collateral notes, bonds, or other personal property, the purchaser of the principal takes with it the right to resort to these securities; and this is so, although the assignment or transfer does not mention them.

Id. at 197 (emphasis added).

¶26 In Tobin, a father, Joseph Tobin, loaned money to a third party. Tobin, 139 Wis. at 494. Joseph named his son, John Tobin, in the note and mortgage related to this loan without informing John; Joseph continued to hold the note and recorded the mortgage. Id. at 494-95. Following John's death, Joseph petitioned the court to declare that John never had any interest in the note and mortgage. Id. at 495. John's widow

13

later opposed the petition. Id. at 495-96. While no transfer of the note from Joseph to John occurred in this case, the court still stated the rule of equitable assignment in its discussion. Id. at 499. It stated, "A mortgage securing a promissory note passes as an incident upon transfer of the note." Id.

¶27 Finally, in Muldowney, Esther Muldowney loaned money to the McCoy Hotel Company (McCoy). Muldowney, 223 Wis. at 64. Muldowney held on to three of the notes that resulted from this loan and endorsed the remaining 12 notes. Id. Later, the Niagara Building Corporation (Niagara) purchased the remaining 12 notes from a third party. Id. McCoy defaulted on its loan and Niagara initiated a replevin action. Id. McCoy argued "that the Niagara Building Corporation cannot maintain this action because no formal assignment of the mortgage or any interest therein was executed and delivered to it in connection with the transfer of the notes." Id. at 65. Although this case addressed a chattel mortgage, the court cited the general principle of equitable assignment in holding in favor of Niagara,

> It is well established that, in the absence of an agreement to the contrary, the purchase of a note or debt secured by a mortgage carries with it the lien of the mortgage, because of which, in the absence of any formal assignment of the latter to the purchaser, he is considered the equitable owner thereof and of the security afforded thereby.

Id. at 65-66.

¶28 Dow argues that these cases, which each support the existence and application of equitable assignment of mortgages,

14

are outdated and distinguishable. We recognize that the cases relied upon by PHH, the court of appeals, and now this court each deal with different issues and factual scenarios. However, we agree with the court of appeals that each case stands for "the general proposition that the security for a note is equitably assigned upon transfer of the note, without the need for a written assignment." Dow Family, LLC, 350 Wis. 2d 411, ¶34. Furthermore, references to equitable assignment principles in Croft are especially noteworthy as that case concerned mortgages on real estate. Likewise, in Tidioute, the court explicitly stated that equitable assignment applies to real estate mortgages.

¶29 We also note that the doctrine of equitable assignment is not unique to Wisconsin case law. In Carpenter v. Longan, 83 U.S. 271, 275 (1872), the United States Supreme Court stated: "The transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter." In the Restatement (Third) of Property (Mortgages) § 5.4(a) (1997) we find additional support for the doctrine of equitable assignment: "A transfer of an obligation secured by a mortgage also transfers the mortgage unless the parties to the transfer agree otherwise."

¶30 Further, we agree with the court of appeals' reliance on Wis. Stat. § 409.203(7) and hold that § 409.203(7) codifies the doctrine of equitable assignment. Chapter 409 sets forth Wisconsin's adoption of the Uniform Commercial Code (UCC) governing secured transactions. Wisconsin Stat. § 409.203(7) is

15

titled, "Lien securing right to payment," and it provides: "The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien."

¶31 The parties disagree over the plain meaning of Wis. Stat. § 409.203(7). Dow argues that the statute "merely means that when a secured debt is itself assigned as a security to another, the original security interest accompanies the debt." In contrast, PHH argues that the language of § 409.203(7) codifies equitable assignment.

¶32 Like the court of appeals, we conclude that each party provides a reasonable interpretation of the plain language of § 409.203(7). Therefore, we must look outside of the plain language of the statute for additional clarification. See Kalal, 271 Wis. 2d 633, ¶50.

¶33 Wisconsin Stat. § 409.203(7) adopted the exact language from Section 9-203(g) of the UCC. Compare U.C.C. § 9-203 (2000), with Wis. Stat. § 409.203(7). The UCC comment to § 9-203(g) provides: "Subsection (g) codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien." U.C.C. § 9-203 cmt. 9 (2000). The language of the comment directly supports PHH's argument that § 409.203(7) codified equitable assignment.

¶34 Finally, the application of equitable assignment to this case results in no unfairness to Dow. Dow spends a

16

considerable amount of time in its brief discussing MERS. In doing so, Dow cites to numerous authorities that have been highly critical of MERS practices. We recognize that MERS has been criticized; however, this case is not about MERS' practices and MERS is not a party to this case.

¶35 Instead, our decision today clarifies the existence and application of equitable assignment in Wisconsin. This clarification results in no unfairness to Dow. First, in general, equitable assignment does not require mortgagors to satisfy anything beyond their debt(s) and accompanying liens. In addition, specific to this case, Dow had notice of the 2001 mortgage prior to the 2009 sale. Here, the title commitment informed Dow of the outstanding 2001 mortgage. Dow apparently relied on information from the Sullivans and their attorney to conclude that the 2001 mortgage was listed on the title commitment in error. However, Dow had full opportunity to investigate the existence of the 2001 mortgage prior to the purchase.

¶36 Our determination that the doctrine of equitable assignment has long existed in Wisconsin, however, does not end our discussion. We next consider the heart of Dow's argument: whether the statute of frauds prevents the application of equitable assignment under these circumstances.

B. EQUITABLE ASSIGNMENT AND THE STATUTE OF FRAUDS

¶37 Generally speaking, the statute of frauds applies to real estate conveyances. It requires that "every transaction by which any interest in land is created, aliened, mortgaged,

assigned or may be otherwise affected in law or equity" must be in writing. Wis. Stat. §§ 706.001, 706.02. Wisconsin Stat. § 706.001(2), however, provides several exceptions to the statute of frauds requirements outlined in Wis. Stat. § 706.02. One such exception includes "transactions which an interest in land is affected by act or operation of law." Wis. Stat. § 706.001(2)(a).

¶38 Dow argues that this exception does not exempt a mortgage assignment from the statute of frauds, which thus invalidates the doctrine of equitable assignment. Specifically, Dow argues that this court should adopt a definition of "by operation of law" that is similar to the definition relied upon by the Michigan Supreme Court in Kim v. JPMorgan Chase, N.A., 493 Mich. 98, 825 N.W.2d 329 (2012). The Michigan Supreme Court explained that "a transfer that takes place by operation of law is one that occurs unintentionally, involuntarily, or through no affirmative act of the transferee." Id. at 117. Under this definition, Dow argues that PHH's acquisition of the mortgage could not have been by operation of law because it occurred intentionally through the assignment of the note.

¶39 PHH asks this court to hold that equitable assignment falls within the "by operation of law" exception found in Wis. Stat. § 706.001(2)(a).

¶40 We agree with PHH and hold that under the doctrine of equitable assignment a mortgage is automatically transferred by operation of law when the note is transferred. Therefore, we hold that the "by operation of law exception" found in Wis.

18

Stat. § 706.001(2)(a) exempts the mortgage assignment at issue from the statute of frauds.

¶41 In reaching our conclusion, we first draw support from Tidioute. There this court stated, "The transfer of these notes to the plaintiffs carried with it, by operation of law, all securities for their payment." Tidioute, 101 Wis. at 197 (emphasis added). Although Tidioute does not explicitly address the statute of frauds, the statute of frauds existed at the time the case was decided.

¶42 Wisconsin Stat. ch. 104, § 2302 (1898) was in operation when this court decided Tidioute in 1898. Section 2302, titled "Conveyance of land, etc. to be in writing" provided:

> No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing.

The statute of frauds operating in 1898 contains substantially similar language to our current statute. Compare Wis. Stat. ch. 104, § 2302 (1898), with Wis. Stat. § 706.001(1)-(2).

¶43 Even earlier evidence exists that the statute of frauds was operating in the background of this court's statements in Tidioute and other early cases discussing equitable assignment. In Yates v. Martin, Justice Hubbell, writing in dissent, stated, "The statute of frauds of this state

19

declares every contract for the sale of any interest in lands void, unless it is in writing . . . ." Yates v. Martin, 2 Pin. 171, 178 (Wis. Jan. 1849).

¶44 Furthermore, we are convinced that equitable assignment can be considered "under operation of law" under Dow's proposed definition of the phrase. Here, PHH allegedly obtained the note through assignment. PHH, however, took no action with regard to the mortgage itself because the mortgage automatically transferred upon the alleged assignment of the note. We consider the automatic nature of the mortgage following the note under equitable assignment to be "by operation of law."

## V. CONCLUSION

¶45 We agree with the circuit court and the court of appeals that the doctrine of equitable assignment is alive and well in Wisconsin. The doctrine's existence is evidenced in our case law, and we are convinced that the case law we rely upon should not be distinguished or discredited due to its age or changes in banking practices. We further conclude that the language of Wis. Stat. § 409.203(7), which governs liens securing the right to payment, codifies equitable assignment. Finally, the application of equitable assignment in this case results in no unfairness to Dow.

¶46 We further hold that the doctrine of equitable assignment does not conflict with the statute of frauds outlined in Wis. Stat. § 706.02. Equitable assignment occurs by

operation of law, which satisfies Wis. Stat. § 706.001(2)(a), a statutory exception to the statute of frauds.

¶47 Therefore, under the doctrine of equitable assignment, we hold that a mortgage automatically passes by operation of law upon the assignment of a mortgage note, which, as we noted above, satisfies a statutory exception to the statute of frauds. Accordingly, we affirm the court of appeals decision, which affirmed the circuit court, in part, reversed in part, and remanded the cause. Like both the circuit court and court of appeals, we conclude that the doctrine of equitable assignment applies and does not violate the statute of frauds; however, the issue of whether PHH has the necessary documents to enforce the note in question was not appealed and must be determined by the circuit court.

*By the Court.*—The decision of the court of appeals is affirmed and cause remanded to the circuit court.

¶48 ANN WALSH BRADLEY, J., did not participate.

¶49 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* This is a mortgage foreclosure case, one of many in Wisconsin and across the country.[1] PHH Mortgage Corporation, which claims to be assignee of the note and the mortgage in the instant case, has been a party in over 2,300 cases filed in the Wisconsin circuit courts, with many cases still open. PHH, and by extension the Mortgage Electronic Recording System (MERS), upon which it relies, represent the modern mortgage system, which has become the subject of frequent litigation in the Great Recession, during which many homeowners have lost the American dream——private home ownership.

¶50 Some fear the economic damage from foreclosures; others fear the economic damage from encumbering the mortgage financing industry. MERS benefits its members, but the question remains whether the MERS system provides benefits to home buyers and borrowers and whether MERS has a deleterious effect on real property and mortgage law.

¶51 I do not join the majority opinion or support its blanket application of the nineteenth-century doctrine of equitable assignment to the modern mortgage system.

¶52 The doctrine of equitable assignment and the longstanding state policy favoring recording of documents

---

[1] After the housing bubble burst, foreclosure filings in Wisconsin "more than doubled from 2005 to 2008." James McNeilly, An Introduction to Mortgage Foreclosure in Wisconsin, Inside Track (State Bar of Wisconsin, Madison, Wis.), Mar. 18, 2009, available at http://www.wisbar.org/newspublications/insidetrack/pages/article.aspx?volume=1&issue=4&articleid=5513 (last visited June 30, 2014).

affecting real estate are being applied to twenty-first-century transactions that were not imagined when the equitable assignment doctrine and the Wisconsin recording statutes developed. The majority opinion does not attempt to address the practical concerns of the current mortgage foreclosure crisis, the realities of the modern mortgage market, the values of the recording system, or the current and future problems associated with the modern mortgage system presented in the instant case.

¶53 My concurrence describes the characteristics of traditional and modern real estate mortgages, the doctrine of equitable assignment, the purpose and value of the recording statutes, and unresolved issues raised by the majority opinion's blanket acceptance of the doctrine of equitable assignment and MERS.

I

¶54 PHH is just one of a long list of MERS's members.[2] Developed in 1993, MERS is a major player in the modern real estate mortgage system and the secondary mortgage market. MERS is a private, "member-based organization" whose members include "lenders, servicers, sub-servicers, investors, and government institutions."[3] Members pay fees to subscribe to MERS's system

---

[2] See MERS Member Search, www.mersinc.org/about-us/member-search (last visited June 30, 2014).

[3] Shelby D. Green & JoAnn T. Sandifer, MERS Remains Afloat in a Sea of Foreclosures, Prob. & Prop., July/Aug. 2013, at 18, 19.

of "electronic processing and tracking of ownership and transfers of mortgages."[4]

¶55 MERS is the mortgagee of record and, as the majority opinion points out, is strangely also the agent for the entity that ultimately holds the note and mortgage.[5] MERS is presumably both principal and agent, and the entity on whose behalf MERS holds legal title to the mortgage changes every time the promissory note is assigned.[6]

¶56 MERS does not have an interest in the promissory notes; it has never had such an interest.[7] Yet sometimes the debtor is advised that MERS does have an interest in the note.[8] Further, MERS does not lend money or collect on the notes secured by mortgages for which it is named as mortgagee.[9]

¶57 MERS facilitates transfers of mortgage notes without the necessity of recording an assignment of the mortgage.[10] Members of MERS avoid recording fees because "MERS remains the

---

[4] MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 83 (N.Y. 2006).

[5] Majority op., ¶13, n.6.

[6] Jackson v. Mortgage Elec. Registration Sys., Inc., 770 N.W.2d 487, 503 (Minn. 2009) (Page, J., dissenting).

[7] Green & Sandifer, supra note 3, at 18, 19.

[8] See majority op., ¶13, n.7.

[9] Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1377-78 (2010).

[10] Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 278 (N.Y. App. Div. 2011).

mortgagee of record" in county recording offices regardless of how many times the note is transferred.[11]

## II

¶58 The doctrine of equitable assignment is a common-law principle that "a transfer of an obligation secured by a mortgage on property also constitutes a transfer of the mortgage."[12] The idea of equitable assignment is that a mortgage has no significance without reference to the note it secures.

¶59 Although the majority opinion concludes "that the doctrine of equitable assignment is alive and well in Wisconsin"[13] "as evidenced by established case law,"[14] its proffered case law does not support its conclusion.

¶60 The majority opinion cites no Wisconsin precedent explaining or applying the doctrine of equitable assignment in a case involving real estate in which the note and mortgage were held by two different persons. See majority op., ¶¶24-28. The

---

[11] Id.

[12] James M. Davis, The Mortgage-Follows-the-Note Rule, Norton Bankr. L. Adviser, Sept. 2013. See also Carpenter v. Longan, 83 U.S. (16 Wall.) 271 (1872); 5 Herbert Thorndike Tiffany, The Law of Real Property § 1449 (3d ed. 1939).

Article 9 of the Uniform Commercial Code, Wis. Stat. § 409.203(7), declares that it codifies the common-law rule of equitable assignment. However, this provision may apply only to personal property. See Uniform Commercial Code Comment 1, Wis. Stat. Ann. § 409.101 (West 2003).

[13] Majority op., ¶23.

[14] Majority op., ¶22.

4

Wisconsin cases upon which the majority relies are not analogous to the instant case.

¶61 The Wisconsin cases cited by the majority opinion do not all involve real estate and do not involve instances in which the note and the mortgage are held by different persons. For example, Tidioute Savings Bank v. Libbey addresses the validity of a guaranty to repay a sum of money after the corresponding notes were sold,[15] and Muldowney v. McCoy Hotel Co. concerns the equitable assignment of a chattel mortgage.[16] The majority opinion glosses over the policy concerns unique to real estate transactions, particularly notice, in its use of these cases.

¶62 More importantly, the Wisconsin cases the majority opinion highlights that do address real estate mortgages concern situations in a traditional setting in which the note and the mortgage are held by the same party, as in Tobin v. Tobin,[17] Croft v. Bunster,[18] and Carpenter v. Longan.[19] In the instant case, however, the foreclosure proceedings were initiated when the note and the mortgage were separated.

---

[15] Tidioute Sav. Bank v. Libbey, 101 Wis. 193, 197, 77 N.W. 182 (1898) (cited by majority op., ¶25).

[16] Muldowney v. McCoy Hotel Co., 223 Wis. 62, 269 N.W. 655 (1936) (cited by majority op., ¶27).

[17] Tobin v. Tobin, 139 Wis. 494, 498, 121 N.W. 144 (1909) (cited by majority op., ¶26).

[18] Croft v. Bunster, 9 Wis. 503, 506 (1859) (cited by majority op., ¶24).

[19] Carpenter v. Longan, 83 U.S. 271, 272 (1872) (cited by majority op., ¶29).

5

¶63 The majority opinion relies on "dicta" in nineteenth- and early-twentieth-century cases (when "dicta" really meant dicta) and applies the dicta to a new set of twenty-first-century facts.

¶64 Modern mortgage transactions differ from traditional mortgage transactions. In the traditional, non-MERS mortgage, the homeowner borrows money from a lender-mortgagee. The lender-mortgagee keeps the note and records the mortgage. The lender-mortgagee may transfer both the note and mortgage but generally keeps them together, and the assignment of the mortgage is ordinarily recorded.[20]

¶65 In a MERS transaction, MERS is neither the lender nor is it the payee on the promissory note. The borrower executes a note to the lender. The borrower executes the mortgage, however, to MERS. MERS is the holder of the mortgage but not of the promissory note. The mortgage is recorded, with MERS as the mortgagee.[21] Under the traditional view of equitable assignment, naming MERS as the mortgagee separates the mortgage from the promissory note and may cause the note to become unsecured.[22]

---

[20] Adam Leitman Bailey & Dov Treiman, Moving Beyond the Mistakes of MERS to A Secure and Profitable National Title System, Prob. & Prop., July/Aug. 2012, at 40, 41.

[21] Silverberg, 86 A.D.3d at 278 ("MERS remains the mortgagee of record in local county recording offices regardless of how many times the mortgage is transferred . . . .").

[22] Restatement (Third) of Property (Mortgages) § 5.4 cmt. a (1997); Christian J. Hansen, Note, Property: Innovations to Historic Legal Traditions——Jackson v. Mortgage Electronic Registration Systems, Inc., 37 Wm. Mitchell L. Rev. 355, 368 (2010).

¶66 The MERS system assists the secondary mortgage market in which mortgages are bought and sold. Many entities may hold a partial interest in the note. Indeed, it is sometimes difficult to track all the assignments of the note.[23] Lenders have been sloppy about keeping track of the promissory notes. In the present case, PHH asserts that it has the note, yet the case is remanded to the circuit court to determine whether PHH actually has the note (and thus the mortgage interest by equitable assignment) entitling it to foreclosure.

¶67 The majority opinion ignores the characteristics of the modern real estate mortgage to find a simple solution to the instant case——a solution that creates its own set of problems.

III

¶68 I turn to the Wisconsin statutes regarding recording of real estate transactions. Wisconsin statutes governing recording of real estate transactions date back to 1849.[24] The recording statutes serve the important purpose of compiling a reliable and public history of title for real estate[25] in order to provide protection, in the form of notice, to all parties

---

[23] See majority op., ¶13 n.7.

[24] Wis. Stat. ch. 59, § 24 (1849) ("Every conveyance of real estate within this state hereafter made, which shall not be recorded as provided by law, shall be void as against any subsequent purchaser in good faith, and for a valuable consideration of the same real estate, or any portion thereof, whose conveyance shall first be duly recorded.").

[25] Kordecki v. Rizzo, 106 Wis. 2d 713, 718 & n.4, 317 N.W.2d 479 (1982) (citing Thauer v. Smith, 213 Wis. 91, 96, 250 N.W. 842 (1933)).

involved in the transfer of real estate, that is, the purchasers, sellers, creditors, and debtors.

¶69 In the nineteenth century, transfers of real estate rights were expected to be documented at the county recording office,[26] and mortgages were rarely separated from the promissory note.[27]

¶70 Today under MERS, MERS remains the mortgagee of record. When MERS members transfer the notes, non-MERS members cannot access the identity of the true owner of a note and mortgage through the public recording system.[28] As Chief Judge Judith Kaye of the New York Court of Appeals has written:

> [T]he MERS system, developed as a tool for banks and title companies, does not entirely fit within the purpose of the Recording Act, which was enacted to "protect the rights of innocent purchasers . . . without knowledge of prior encumbrances" and to "establish a public record . . . ." It is the incongruity between the needs of the modern electronic secondary mortgage market and our venerable real property laws regulating the market that frames the issue before us.[29]

---

[26] W. Scott Van Alstyne, Jr., Land Transfer and Recording in Wisconsin: A Partial History—Part I, 1955 Wis. L. Rev. 44, 44-45 (describing the recording process as expressing "a basic social value" underlying the recording system).

[27] See, e.g., Carpenter v. Longan, 83 U.S. 271, 272 (1872) ("[T]he note and mortgage" were assigned to the appellant); In re Tobin's Estate, 139 Wis. 494, 498, 121 N.W. 144 (1909) ("[T]he note and the mortgage" were in the name of the same person).

[28] MERS tracks member-to-member mortgage assignments within its private system, leaving non-MERS members unaware of these assignments. Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 278 (N.Y. App. Div. 2011).

[29] Romaine, 861 N.E.2d at 86 (Kaye, C.J., dissenting in part) (citations omitted).

8

¶71 The modern mortgage system represented in the instant case by MERS and PHH has increasingly challenged Wisconsin's recording statutes and the state's strong policy in favor of recording all real estate transactions. The recording system fosters disclosure of real estate transactions; MERS fosters secrecy. Under the MERS system, a borrower may access only his or her loan servicer, not the underlying lender.[30] As Chief Judge Kaye has written, this secrecy and avoidance of public recording have undesirable consequences:

> The lack of disclosure may create substantial difficulty when a homeowner wishes to negotiate the terms of his or her mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity. Public records will no longer contain this information as . . . the MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a noteholder from liability, mask lender error and hide predatory lending practices.[31]

IV

¶72 Mortgage foreclosure actions are frequently before the Wisconsin circuit courts. Numerous issues may arise from the application of the equitable assignment doctrine to the MERS system. Indeed, we do not know the extent of the concerns that

---

[30] Bailey & Treiman, supra note 20, at 40, 42. ("MERS does not allow nonmembers access to any of its records.").

[31] Romaine, 861 N.E.2d at 88 (Kaye, C.J., dissenting in part).

9

will be realized.  They are left for another day.  Here are a few raised in the case law and the literature:

- Does MERS have standing to bring a foreclosure action?

- Must MERS assign the mortgage to the note owner before a foreclosure action can be initiated?

- What difference does it make that an assignment of the promissory note operates as an <u>equitable</u> rather than <u>legal</u> assignment of the security instrument?

- Can legal and equitable title be separated?

- Must the entity seeking to foreclose have both equitable and legal title?

- What information must be disclosed to the borrower when the mortgage transaction is negotiated?

- What protocols are warranted for dealing with a borrower in financial distress?

- Does the lack of disclosure create difficulty when the homeowner wants to renegotiate the terms of the mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity?

- Does the majority opinion preclude federal remedies that are otherwise available to homeowners?

- Are existing rules on negotiable instruments suitable for transfers of mortgages?

- What is the distinction between note ownership and entitlement to enforce a note?

- What is the impact of the comment to Restatement (Third) of Property (Mortgages) § 5.4 cmt a. (1997), which states, "When the right of enforcement of the note and the mortgage are split, the note becomes, as a practical matter, unsecured"?[32]

¶73 It seems wise, at a minimum, to call the legislature's attention to the disparity that exists between the recording statute and the modern-day electronic mortgage industry.

¶74 Although the outcome in the instant case seems reasonable enough, I cannot join the majority opinion, whose ramifications stretch far beyond this case.

¶75 For the foregoing reasons, I write separately.

---

[32] These questions and more are discussed in U.S. Bank National Ass'n v. Ibanez, 941 N.E.2d 40 (Mass. 2011); Silverberg, 86 A.D.3d at 278; Jackson, 770 N.W.2d at 490, 500-02; Shelby D. Green & JoAnn T. Sandifer, MERS Remains Afloat in A Sea of Foreclosures, Prob. & Prop., July/Aug. 2013; Zachary A. Kisber, Reevaluating MERS in the Wake of the Foreclosure Crisis, 42 Real Est. L.J. 183 (2013); Bailey & Treiman, supra note 20, at 40; Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory, 53 Wm & Mary L. Rev. 111 (2011).