In the MATTER OF the GUARDIANSHIP OF B. C. L.-J.:

M. L.-F., Appellant,

v.

ONEIDA COUNTY DEPARTMENT OF SOCIAL SERVICES,
Respondent.
[Case No. 2015AP553]

In the MATTER OF the GUARDIANSHIP OF B. N. L.-J.:

M. L.-F., Appellant,

v.

ONEIDA COUNTY DEPARTMENT OF SOCIAL SERVICES,
Respondent.
[Case No. 2015AP554]

Court of Appeals

*Nos. 2015AP553, 2015AP554. Submitted on briefs
December 22, 2015.—Decided February 23, 2016.*

2016 WI App 25

(Also reported in 877 N.W.2d 401.)

On behalf of the appellant, the cause was submitted on the briefs of *Patrick H. Finlan*, Rhinelander.

On behalf of the respondent, the cause was submitted on the brief of *Brian J. Desmond,* corporation counsel, Rhinelander.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. STARK, P.J. M. L.-F. appeals orders dismissing her Wis. Stat. ch. 54[1] petitions for guardianship of her twin grandsons. The central issue on appeal is whether an order under Wis. Stat. § 48.427 that terminated the children's parents' parental rights and ordered guardianship with the State of Wisconsin required dismissal of M. L.-F.'s previously filed, but stayed, ch. 54 guardianship petitions. M. L.-F. argues Wis. Stat. § 48.977(8)(b) expressly allowed her to file the ch. 54 petitions. We agree with M. L.-F.'s interpretation of that statute. Nevertheless, we conclude that, under the specific circumstances of these cases, Wis. Stat. § 48.15 precluded the circuit court from granting M. L.-F.'s ch. 54 petitions. We therefore affirm.

## BACKGROUND

¶ 2. M. L.-F.'s grandsons were born in April 2011. They lived with their mother from their birth until July 25, 2012, when they were removed from her home by the Oneida County Department of Social Services (the Department) and placed in the A.K. foster home.[2]

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

[2] The children's father was incarcerated from the time they were born until September 2013. Following his release, the conditions of his probation and parole prevented him from seeing the children until October 2014. The first time he saw the children was December 2, 2014, the day before the dispositional hearing in the TPR proceedings.

The Department filed petitions for protection or services regarding the children the following day.

¶ 3. Based on the admissions of both parents, the children were found to be in need of protection or services (CHIPS) under Wis. Stat. § 48.13(8) and (10). A dispositional hearing was held on September 5, 2012. Following the hearing, the circuit court entered orders continuing placement in the A.K. foster home for one year. As relevant to these appeals, each dispositional order contained a permanency plan with a primary goal of reunification with the parents and a concurrent goal of placement with a fit and willing relative.

¶ 4. The Department subsequently sought approval, pursuant to the interstate compact for the placement of children, to have the children placed with M. L.-F. and her husband, C. F., in Minnesota.[3] *See* Wis. Stat. § 48.99. Before the children were removed from their mother's home, they had had regular contact with the grandparents. About once per month, the grandparents would drive six hours to Oneida County to pick up the children and would take them to Minnesota for three to seven days before driving them home. After the children were removed from their mother's home, the grandparents were initially limited to visiting the children in Oneida County. However, in the fall of 2012, the Department gave the grandparents permission to resume taking the children to Minnesota for visits.

¶ 5. Pursuant to the interstate compact, the Meeker County, Minnesota social services department performed a home study regarding the grandparents. In January 2013, it issued a report recommending that

_____
[3] For ease of reference, we refer to M. L.-F. and C. F., collectively, as "the grandparents."

the children not be placed in the grandparents' home. The Department adopted that recommendation. M. L.-F. later testified that the Department never contacted her to discuss the contents of Meeker County's report. She did not receive a copy of the report until March or April 2013, when she obtained a copy from her son's attorney. M. L.-F. asserts she did not understand that the report recommended the children not be placed with her.

¶ 6. On July 23, 2013, the circuit court held a hearing to extend and revise the CHIPS dispositional orders and review the children's permanency plans. Neither parent was present at the hearing. M. L.-F. asserts, and the Department does not dispute, that she received no notice of the July 23 hearing and therefore did not attend. At the hearing, placement of the children was continued in the K.s' foster home. In addition, the children's permanency plan goals were changed to a primary goal of placement with a fit and willing relative and a concurrent goal of adoption.

¶ 7. On January 14, 2014, another hearing was held to review the children's permanency plans. At that time, the circuit court changed the primary goal of each permanency plan to adoption, with no concurrent goals. The children's father appeared by telephone at the January 14 hearing and objected to the change in permanency plan goals. Again, it is undisputed that M. L.-F. did not receive notice of the January 14 hearing.

¶ 8. On March 26, 2014, the Department filed petitions to terminate both parents' parental rights to the children. As grounds, the petitions alleged failure to assume parental responsibility, abandonment, and continuing CHIPS. Both parents ultimately admitted

that grounds existed to terminate their parental rights. A dispositional hearing was scheduled for December 3, 2014.

¶ 9. Meanwhile, on November 12, 2014, M. L.-F. filed the Wis. Stat. ch. 54 petitions for guardianship of the children that are at issue in these appeals.[4] On November 25, 2014, the circuit court stayed proceedings on M. L.-F.'s petitions, pending the conclusion of the termination of parental rights (TPR) proceedings.[5]

¶ 10. M. L.-F. then moved to "participate" in the TPR proceedings. The circuit court denied that motion at the beginning of the December 3, 2014 dispositional hearing. *See David S. v. Laura S.*, 179 Wis. 2d 114, 133–47, 507 N.W.2d 94 (1993) (grandparents not entitled to participate as parties in TPR proceedings). However, the court ruled that the grandparents would be allowed to testify at the hearing.

¶ 11. During the dispositional hearing, the court heard testimony from the grandparents, the children's foster mother, the social worker assigned to the case, and the children's father. Both grandparents asked the

---

[4] The Department asserts M. L.-F. had previously filed Wis. Stat. ch. 54 guardianship petitions regarding the children on April 4, 2014. The Department further contends that proceedings on those petitions were stayed, on the guardian ad litem's motion, and the cases were thereafter "concluded" because the court failed to hold a hearing within ninety days and therefore lost jurisdiction. *See* Wis. Stat. § 54.44(1)(a). These assertions, however, are not supported by documents in the appellate record.

[5] The Honorable Michael H. Bloom presided over both the TPR proceedings and M. L.-F.'s guardianship petitions.

The transcript of the November 25, 2014 hearing is not in the record. However, the parties agree that the circuit court stayed proceedings on M L.-F.'s Wis. Stat. ch. 54 guardianship petitions during that hearing.

court to grant them guardianship of the children. In addition, counsel for the children's father specifically argued that, regardless of whether the father's parental rights were terminated, the court should grant M. L.-F. guardianship. Counsel for the children's mother also asked the court to "seriously consider . . . guardianship with the paternal grandparents."

¶ 12. After considering the factors set forth in WIS. STAT. § 48.426(3), the circuit court terminated both parents' parental rights to the children and granted guardianship to the State of Wisconsin, via Lutheran Social Services, pending adoption. As relevant to these appeals, the court acknowledged that the children had a substantial relationship with the grandparents, and that severing that relationship completely would be harmful to the children. Nevertheless, the court reasoned:

> But to what extent at this point in time would it be harmful to the children to remove them from the home that they have been in over the course of the last 28 months, during which they have formed a substantial and healthy parental relationship with Mr. and Mrs. [K.]? How harmful would that be? And in my judgment, it would be vastly more harmful.

The court noted that, when the children were first placed in the K.s' home, "the game plan was to have them placed with [the grandparents]," but that plan had changed due to the interstate compact recommendation. The court stated:

> There's been a lot of discussion about the home study that was conducted . . . .
>
> [A] legitimate question is, you know, is it incumbent upon the Oneida County Department of Social Ser-

vices to proactively get involved to resolve issues that were pointed out regarding a potential placement by an out-of-state agency?

Now, you know, it is possible that had certain things occurred between [the grandparents] and the agency in Minnesota and the Oneida County Department of Social Services immediately following the home study that was conducted, and had some issues been sorted out to the satisfaction of the Minnesota agency and the Oneida County Department of Social Services, and the children been placed with [the grandparents], could that have happened if somebody had kind of taken the bull by the horns? Maybe.

And even if we assume that, yes, if the right person at the right time had picked up the phone and got the right other person on the phone and said, I need to talk to you about some of the stuff that's in this report, could that have resulted in some change in the lay of the land so that the boys would have been placed back in early 2013 with [the grandparents]? Even if we assume that could have happened—maybe it could have, maybe it wouldn't have—but if we could assume that it could have, we are nearly two years down the line, and when you are talking about three-and-a-half-year-old children, that is a lot of time. The clock is ticking and, at this point, the Court has to look at, will it be in the children's best interest? Will it benefit them? Will it make their lives better in the long run if we try to correct now something that possibly was flawed two years ago by removing the children from a relatively stable, healthy environment with the [K.s], and put them into a different environment that I'm assuming would also be a fit healthy household?

In my judgment, that would not be in the children's best interest and would be basically starting a similar process over again. If it's true that the situation could have been corrected back in early 2013 . . . the evi-

705

dence suggests that changes, even temporary changes, in the short-term stability of these boys is disruptive.

The court concluded:

> [W]hile under other circumstances, much of the record today would potentially support a finding that placement of these boys with [the grandparents] is appropriate, I cannot find, based on this record, that it would be in the best interests of these boys at this time to remove them from the care of Mr. and Mrs. [K.] in light of the likelihood that they will be able to adopt these children[.]

¶ 13. The children's father filed a notice of appeal from the orders terminating his parental rights. His attorney filed a no-merit report, and we affirmed the TPR orders.

¶ 14. On February 3, 2015, two months after the dispositional hearing in the TPR proceedings, the circuit court entered written orders dismissing M. L.-F.'s WIS. STAT. ch. 54 guardianship petitions. M. L.-F. had argued WIS. STAT. § 48.977(8)(b) authorized her to "pursue [her] Chapter 54 guardianship petition[s] in union with pending Chapter 48 proceedings." The circuit court rejected M. L.-F.'s interpretation of § 48.977(8)(b) and noted she had cited no other authority "in support of [her] contention that a Chapter 54 guardianship action may proceed alongside a pending Chapter 48 proceeding." The court also stated dismissal was appropriate in light of the statutory policy set forth in WIS. STAT. § 48.15. M. L.-F. now appeals.

## DISCUSSION

¶ 15. M. L.-F. argues the circuit court misinterpreted WIS. STAT. § 48.977(8)(b), and, as a result, it erroneously dismissed her WIS. STAT. ch. 54 guardian-

ship petitions. She asserts § 48.977(8)(b) expressly permitted her to file ch. 54 petitions for guardianship of the children. The circuit court, however, determined § 48.977(8)(b) was inapplicable under the circumstances.

▬▬

¶ 16. The proper interpretation of WIS. STAT. § 48.977(8)(b), which appears to be a matter of first impression, presents a question of law that we review independently. *See Domino v. Walworth Cty.*, 118 Wis. 2d 488, 493, 347 N.W.2d 917 (Ct. App. 1984). When interpreting a statute, our objective "is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. Our analysis begins with the plain language of the statute. *Id.*, ¶ 45. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* In addition, statutory language must be interpreted "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.* (quoting *Bruno v. Milwaukee Cty.*, 2003 WI 28, ¶ 20, 260 Wis. 2d 633, 660 N.W.2d 656).

¶ 17. WISCONSIN STAT. § 48.977(2) permits a circuit court to appoint a guardian of the person for a child adjudged to be in need of protection or services when certain criteria listed in the statute are met. Only

certain persons may file a petition for the appointment of a guardian under § 48.977(2). *See* § 48.977(4)(a). Grandparents are not among the persons listed in the statute, and M. L.-F. does not otherwise qualify as an individual authorized to file a § 48.977(2) guardianship petition. *See* § 48.977(4)(a). Thus, it is undisputed that M. L.-F. could not petition for guardianship of the children under § 48.977(2).[6] However, § 48.977(8)(b) provides, "Nothing in this section prohibits an individual from petitioning a court under ch. 54 for appointment of a guardian." M. L.-F. contends this language expressly authorized her to petition for guardianship of the children under Wis. Stat. ch. 54, despite her inability to petition under § 48.977(2).

■

¶ 18. We agree with M. L.-F.'s interpretation of Wis. Stat. § 48.977(8)(b). The statute is not ambiguous. It clearly states that nothing "in this section" prohibits a person from filing a guardianship petition under Wis. Stat. ch. 54. *See* § 48.977(8)(b). The words "in this section" unambiguously refer to the statutory section in which they are found—namely, § 48.977. In other words, § 48.977(8)(b) provides that, if there is something in the text of § 48.977 that would prohibit a person from filing a guardianship petition under that section, the person may nevertheless file a petition under ch. 54. Here, § 48.977(4)(a) prohibits M. L.-F. from filing § 48.977 guardianship petitions because she is not one of the persons whom para. (4)(a) permits to do so. Nonetheless, § 48.977(8)(b) provides that,

---

[6] Although M. L.-F. could not file a guardianship petition under Wis. Stat. § 48.977(2), she could nevertheless have been appointed guardian if one of the persons listed under § 48.977(4)(a) had filed a petition requesting her appointment.

despite this prohibition, M. L.-F. is not precluded from filing ch. 54 guardianship petitions.

¶ 19. The circuit court interpreted WIS. STAT. § 48.977(8)(b) differently. It interpreted the words "in this section" to mean that § 48.977(8)(b) had no application unless a guardianship petition under that section had already been filed. No guardianship petitions were filed under § 48.977, and therefore, the court determined M. L.-F. had no authority under § 48.977(8)(b) to file WIS. STAT. ch. 54 guardianship petitions. Stated differently, the court interpreted § 48.977(8)(b) to mean that, when a guardianship petition has been filed under § 48.977, nothing in § 48.977 prohibits an individual from filing a ch. 54 guardianship petition. However, that is not what the plain language of the statute says. To accept the circuit court's interpretation as correct, we would have to read the words "when a petition has been filed under this section" into the statute. "We should not read into the statute language that the legislature did not put in." *State v. Matasek*, 2014 WI 27, ¶ 20, 353 Wis. 2d 601, 846 N.W.2d 811 (quoting *Brauneis v. LIRC*, 2000 WI 69, ¶ 27, 236 Wis. 2d 27, 612 N.W.2d 635).

¶ 20. Our conclusion that WIS. STAT. § 48.977(8)(b) permitted M. L.-F. to file WIS. STAT. ch. 54 guardianship petitions does not, however, end the analysis. Regardless of whether M. L.-F. was permitted to file the petitions, the operative issue is whether the circuit court erred by dismissing those petitions after the TPR orders were entered. The circuit court reasoned dismissal was required "in light of the statutory policy set forth in [WIS. STAT. §] 48.15[.]" We agree with that conclusion.

¶ 21. WISCONSIN STAT. § 48.15 states, in relevant part, that "the jurisdiction of the court assigned to

709

exercise jurisdiction under this chapter . . . is paramount in all cases involving children alleged to come within the provisions of ss. 48.13 and 48.14[.]" When applying this statute in a case involving conflicting rulings by a juvenile court and a divorce court, our supreme court explained:

> The statute makes the jurisdiction of the juvenile court paramount to that of the divorce court. This means at least that the burden is on the divorce court to avoid taking action which is or is likely to be in conflict with action taken by the juvenile court. As a matter of comity, the divorce court should under most circumstances stay its proceeding when a proceeding involving the same child is instituted in the juvenile court until the juvenile court reaches a determination. But it seems reasonable that the divorce court retains jurisdiction to do anything which does not conflict with the orders and findings of the juvenile court.

*State ex rel. Rickli v. County Court of Dane Cty.*, 21 Wis. 2d 89, 96–97, 123 N.W.2d 908 (1963).

¶ 22. Pursuant to WIS. STAT. § 48.15 and *Rickli*, the circuit court properly stayed proceedings on M. L.-F.'s WIS. STAT. ch. 54 guardianship petitions until the TPR proceedings were concluded. However, the court "retain[ed] jurisdiction" to do anything that did not conflict with its orders and findings in the TPR cases. *See Rickli*, 21 Wis. 2d at 97. Thus, once the TPR proceedings were concluded, the court was free to consider the petitions. *See id.* Under the specific circumstances of these cases, though, granting the petitions would have conflicted with the TPR orders.

¶ 23. As noted above, during the dispositional hearing in the TPR proceedings, both grandparents

testified they wanted the court to award them guardianship of the children. In addition, both parents' attorneys asked the court to award the grandparents guardianship. However, the circuit court expressly rejected these requests for the reasons set forth above. In short, the court found that it would not be in the children's best interest to grant the grandparents guardianship because it would be too harmful to the children to sever their relationship with their foster parents, with whom they had been placed for an extended period and who had expressed a desire to adopt them. Given the court's specific refusal during the TPR proceedings to award the grandparents guardianship of the children, a subsequent decision to grant M. L.-F.'s WIS. STAT. ch. 54 guardianship petitions would have directly conflicted with the findings and orders entered in the TPR cases. Consequently, the circuit court was precluded from granting the ch. 54 petitions, pursuant to WIS. STAT. § 48.15 and *Rickli*, and, as a result, it properly dismissed the petitions.

*By the Court.*—Orders affirmed.